**Melissa K. LANDIS, Appellant,**

v.

**Eric O. LANDIS, Appellee.**

Superior Court of Pennsylvania.

Submitted Dec. 7, 2004.
Filed Feb. 23, 2005.

Harry M. Ness, York, for appellant.

Claudia L. DeArment, York, for appellee.

BEFORE: BENDER, PANELLA and MONTEMURO *, JJ.

---

* Retired Justice assigned to Superior Court.

OPINION BY BENDER, J.:

¶ 1 Melissa K. Landis (Mother) appeals from the April 20, 2004 order that awarded to Mother sole legal custody of her and Eric O. Landis's (Father) son (P.G.L.) and provided for a shared custody arrangement between the parents on a three-day/two-day alternating two-week schedule. However, the order denied Mother's request to relocate from York, Pennsylvania to Corry, Pennsylvania, a distance of about 300 miles. We reverse and remand.

¶ 2 Mother and Father were married on June 26, 1999, and separated in May of 2003, in connection with the filing of a protection from abuse (PFA) petition by Mother. The parties are the parents of P.G.L., who was born on July 3, 2002. The complaint for custody was filed by Mother as part of her complaint in divorce on May 20, 2003. Mother requested joint legal custody and primary physical custody of P.G.L. In her Memorandum for Custody Pre–Trial Conference, Mother expressed her desire to relocate to the northwestern part of the Commonwealth to be closer to her family members who live in New York State. Thus, at the custody trial, the court was to consider legal and physical custody, as well as, relocation.

¶ 3 The certified record in this case reveals the following facts. Mother has a degree in education and is state-certified in both elementary and special education. She taught school in Corry, Pennsylvania, which is located about 90 miles from Arcade, New York, where her parents and Father's parents live. Mother began dating Father prior to taking the teaching job in Corry and while Father was completing his masters degree in psychology. The parties became engaged and moved in together in Corry. However, due to Father's inability to find a job in that area, they moved to York County where Father was hired by the Lincoln Intermediate Unit (LIU), and assigned to the Dover Area School District. Father also began part time work as a therapist in a mobile therapy setting. Mother found employment with the Dover Area School District.

¶ 4 At present Mother is employed by the Central York School District, while Father does mobile therapy. He is on leave without pay from the LIU due to outstanding criminal charges that arose following the issuance of the PFA, which was still in force at the time of the custody hearing. The parties were having financial difficulties that appear in large part to be due to Father's use of numerous credit cards to buy guns, knives, ammunition, G.I. Joe dolls and military scaled vehicles, which he claims he collects and buys and sells through the internet. By April 2003 the credit card debt amounted to close to $40,000, although a year earlier the parties had secured a second mortgage to pay off credit card debt of at least $35,000.

¶ 5 A confrontation occurred on April 28, 2003, that caused Mother to seek refuge for herself and P.G.L. at ACCESS York, a women's shelter.[1] Following testimony at the PFA hearing, a consent decree was issued, which required Father to move out of the marital home and refrain from contacting Mother for an 18–month period, but allowed for shared custody of P.G.L. by both parents.[2] The PFA court made no finding of abuse.

1. Mother testified at the custody hearing that Father "threatened—said he has been so angry with me, that he has had thoughts of killing me and then himself, and I asked him, 'Well, when and how?' He said he had the pillows and he had a Glock." N.T. Trial, 4/19/04, at 87. Mother also submitted into evidence photographs taken at the shelter showing bruising on her legs.

2. A pre-trial custody conciliation conference took place on July 3, 2003, but the parties

¶ 6 At the time the PFA order was served, sheriff deputies confiscated 176 weapons from the marital home. A large amount of ammunition was also removed from the property. Then in October of 2003, Father violated the terms of the PFA order and he was found guilty of indirect criminal contempt. Father was also charged criminally with possession of illegal weapons and possession of marijuana. Although Mother indicated that Father received an ARD disposition, Father's testimony is less clear on the issue and it appears that at the time of the custody hearing the criminal matter had yet to be resolved.

¶ 7 At the custody trial, held on April 19–20, 2004, Mother testified about the parties' financial situation and indicated that she would soon have to move out of the marital residence due to a foreclosure action. She also testified that her job with Central York School District was in jeopardy because of her numerous absences due to court appearances for hearings on the PFA, the criminal contempt trial and the custody proceedings. Additionally, Mother testified about the day care facility she used for P.G.L. when he was in her custody. However, she stated that Father did not inform her about his arrangements for P.G.L. when the child was in Father's custody.

¶ 8 Mother further provided information about her desire to move back to Corry, Pennsylvania. She indicated that the Corry School District had offered her a teaching position for $40,800, an amount $2,800 above her current salary, plus $550 for moving expenses. She also noted that both her current and her new position include health benefits, which cover both Mother's and P.G.L.'s medical expenses.[3]

Moreover, Mother discussed her wish to move, indicating that she would have the support of her family, including her parents and her siblings with their families all within at most a two hour drive. She also indicated that Father's family would have much easier access to P.G.L. since they also lived in the area near her parents. Additionally, Mother indicated that prior to separation she, Father and P.G.L. had traveled to see their families almost every month.

¶ 9 Additionally, Mother expressed her willingness to drive half of the 300 mile distance to meet Father so that he could more easily share in the custody of P.G.L. in York. She also suggested that she could transport P.G.L. to Arcade, New York, to Father's parents' home, to allow Father additional periods of custody. Moreover, she proposed extended custody time for Father during the summer months, except for an annual Canadian vacation that she took with her family.

¶ 10 With regard to Father's testimony, he explained that since vacating the marital home he has lived in a one-bedroom apartment. Father further testified about his present position as a mobile therapist and that he can set his own hours to accommodate the custody schedule. He also indicated that although he is on anti-depressant medication, it does not affect his work or his ability to care for P.G.L. When discussing the PFA, Father emphasized that the order entered into was by consent and that the court made no finding of abuse. Father also emphasized that Mother had not sought to prevent Father from seeing P.G.L., because she wanted Father and son to have a relationship. As for the indirect criminal contempt conviction, Father acknowledges that he was

could not come to an agreement. Therefore, the trial court entered an interim order for shared custody. Order, 7/17/03.

3. P.G.L. suffers from asthma.

found guilty, but points out that the custody arrangement was not altered.

¶ 11 Father presented the report and testimony of Michael F. Ditsky, M.A., M.Ed., a licensed psychologist, who conducted a custody evaluation at Father's request. Mr. Ditsky's report indicated that he interviewed each parent, administered the MMPI–2 test[4] to each parent, and observed each parent's interaction with P.G.L., whose behavior he concluded was age appropriate. Specifically, as to his observation of P.G.L., Mr. Ditsky found that the child was attached to and had bonded with each parent. Mr. Ditsky also reported that he had reviewed a letter from the district attorney indicating the denial of Father's acceptance into the ARD program, the police criminal complaint, the PFA court transcript and order, copies of correspondence between the parties' attorneys and between the parties themselves. Mr. Ditsky was also aware of the criminal contempt conviction, which he relates to Father's attempt to discuss a reconciliation with Mother, and that 176 weapons were confiscated from the residence. Mr. Ditsky also acknowledged that Mother showed him the pictures of her bruises, but stated that "I have focused, however, on the issues that I perceive to be relevant and germane to custody." Mr. Ditsky's Report, 10/10/03, at 2. In that regard, Mr. Ditsky reported that:

> Each adult was cooperative and compliant throughout the course of the evaluations. [They] have not resolved their differences with regard to the marriage.

There is an ongoing struggle regarding what is best for [P.G.L.]. Both have the potential of being good parents, nonetheless. Both registered pride and affection for their son.

*Id.* at 5.

¶ 12 Additionally, Mr. Ditsky noted that he believed Mother intended to relocate, but stated that "I am not prepared to ascertain whether or not the criteria are fulfilled for this to take place." *Id.* at 6. Finally, Mr. Ditsky concluded that he would recommend a joint custody arrangement, because he "see[s] each parent contributing the best each has to offer in providing nurturance and care to [P.G.L.]'s continued development." *Id.*

¶ 13 Interestingly, during his testimony, Mr. Ditsky was questioned by the court concerning the child's age and his relationship with each parent. Mr. Ditsky explained that between the ages of 18 to 24 months a child's attachment to his parents is solidified so that then the child can develop his ability to begin to explore his environment. After that time, Mr. Ditsky explained, children begin developing more of an awareness of their place in the outside world. Again in answer to the court's question, Mr. Ditsky opined that although telephone calls and pictures could insure that P.G.L. and Father could maintain a long distance relationship, regular interaction with each parent promoted a better relationship rather than "large chunks of time periodically." N.T. Trial, 4/19/04, at 53.[5]

---

4.  Minnesota Multiphasic Personality Inventory–2.

5.  Father also offered the testimony of Tracy Lynn Hutchins, a friend of his who provides care for P.G.L. six to eight hours per week. Ms. Hutchins indicated that Father was an excellent father. N.T. Trial, 4/19/04, at 270–75. Lastly, Mother presented rebuttal testimony from Lori E. Hubbard, Mother's sister,

who spoke with Father on the telephone on May 17, 2003. Ms. Hubbard testified that Father rambled on for about forty minutes indicating he had just smashed the windshield of his car and implied that he might commit suicide and that if Mother returned to the house he could not be held accountable for his actions. *Id.* at 278–83.

¶ 14 At the conclusion of the custody trial, the court announced its decision, granting Mother sole legal custody and ordering a continuation of shared physical custody between Mother and Father. However, Mother's request to relocate was denied. The court also provided its reasons for the order from the bench and, thus, its opinion filed pursuant to Pa. R.A.P. 1925(a) merely directs this Court to pages 284 through 305 of the trial transcript.

¶ 15 We now attempt to highlight the court's basis for its decision. The court set forth a discussion about all the factors it was required to consider in making its decision as to custody generally, shared custody in particular, and those factors applicable to a relocation request. The court found that the most significant factor that impacted its decision centered on P.G.L.'s age in "that he is at the age where he's formulating attachments to both parents." N.T. Trial, 4/20/04, at 295.

¶ 16 Specifically, in discussing its assessment of the parties, the court stated that:

[Mother] strikes us as being fairly level-headed, and again, with regard to parenting abilities, nothing would indicate that she is anything less than a concerned, appropriate parent.

She does complain that [F]ather's decision-making leaves something to be desired, and we would frankly concur in that. Amassing a number of articles for alleged resale and putting the parties in financial jeopardy is certainly evidence of poor decision-making on [F]ather's part, but not necessarily poor parenting.

She is also concerned significantly with [F]ather's preoccupation with weapons of all sorts, as is the Court, and we believe under the circumstances our schedule which limits long periods of contact with both parties would be an appropriate schedule for [M]other to monitor on a regular basis the child's development of the relationship with [F]ather.

There was very little testimony on who the primary caretaker of this child was. Obviously the child is only one year old. Mother would have preferred to stay home, but the parties found it financially unable [sic] to do so. Accordingly, we make no finding with regard to that particular issue. It certainly does not favor one party over another with regard to who the primary caretaker was.

. . . .

We note that [F]ather does not particularly respect Court processes, in that he pled guilty to a charge of Indirect Criminal Contempt resulting from the underlying Protection From Abuse proceeding. Obviously he doesn't know how to follow Court Orders in that regard, and [F]ather complains about a lack of cooperation from [M]other basically, which is a similar complaint that [M]other has about [F]ather. We find quite frankly that both parties are somewhat unreasonable when it comes to cooperating. That cooperation was certainly made more difficult by the Protection From Abuse matter that resulted in an Order being entered against [F]ather, and we will deal with that issue when we talk about credibility of the parties later in this proceeding.

. . . .

When we consider statutory factors, we note we are required to consider crimes and abuse. We find that [F]ather did abuse [M]other during the particular time involved by the underlying Protection From Abuse action. We find [F]ather's testimony incredible, quite frankly, about that whole issue, and that therefore casts doubt upon a lot of [F]ather's testimony. We find that he pled

guilty to an Indirect Criminal Contempt, which is a violation of the Protection From Abuse Order, and we take that into consideration in this particular matter.

We are also required to determine which parent will foster a relationship with the non-custodial parent. We conclude that [M]other is not likely to, since there is testimony that first of all she wants to move, which by its very nature is going to deprive [F]ather of significant rights of custody. She only wants to give [F]ather one-half of the summer and other days which are basically incidental, and frankly the distance away that she wants to move would make it very difficult for [F]ather to maintain any kind of a consistent, ongoing relationship with the child.

Of course we cannot consider that [F]ather would be likely to foster a relationship with [M]other since he didn't tell [M]other his current address or phone number, refused to agree to an appropriate day care arrangement, did not tell [M]other about the new babysitter, and quite frankly offers excuses to the Court which are absolutely ridiculous, which now brings us to the credibility of the parties.

We frankly have doubts about some of [M]other's testimony based on her incredulous or incredible testimony regarding her alleged lack of knowledge of the weapons and guns, gun sales, those factors at the residence, and frankly we have doubts about [F]ather's credibility when he denies abuse.

We note that [F]ather was not able to give separate answers to simple questions without lengthy and quite frankly farfetched excuses and explanations, and it does not give us a lot of confidence that [F]ather is able to make rational decisions concerning the child without offering inappropriate explanations and excuses, and for that reason, and for the reason that quite frankly we think it would be very frustrating for [M]other to have to deal with [F]ather and get his cooperation on major issues involving this child, it was quite frankly frustrating for the Court to have to listen to father during most of his testimony, but that aside, we have made the decision to award [M]other sole legal custody in this particular case.

*Id.* at 296–97, 298, 299–101. Thus, it appears that the court's decision to award Mother sole legal custody is to a great extent based upon its perception that Father would not be able to make rational decisions with regard to P.G.L., his abuse of Mother and his lack of cooperation with Mother, despite finding that because Mother wished to relocate she lacked the ability to cooperate also.

¶ 17 As for the relocation issue, the court stated:

In this particular case, when we consider the potential advantages of the proposed move, we note that the economics of the move would perhaps result in somewhat of a lesser cost of living to [M]other, although that perhaps is somewhat speculative. There is approximately a $2,000 increase in her salary, although depending again on her raise, potential raise with her current school district, that is somewhat speculative. In any event, even if we assume all of that, we cannot conclude that the move would substantially improve the quality of life of the child.

When we look at the disadvantages of the proposed move, it comes back to the fact that the child would be deprived of substantial periods of time with the [F]ather in an attempt to develop a relationship with the [F]ather at the time period in the child's life when the child

should be forming such relationships with both parents, and we conclude that that factor far outweighs any potential advantages of the proposed move that mother may realize.

We also note as we previously said that [M]other's financial circumstances would, in fact, follow her to her new move. She has substantial debt. When we look at the non-economic aspects of the move, she's indicated that she wants to move to be closer to family. While it certainly has some advantages as far as emotional advantages, again, this is far outweighed by the requirement that both parents be available for the child on a regular basis for the child to begin forming attachments to the parents.

When we look at the motives of the [M]other for moving and [F]ather for resisting the move, we conclude that [M]other does have appropriate motives for moving. She, as indicated, was moving for a slight increase in pay, and also to be with her family. Father is resisting the move on the basis that he wants to see the child on a regular basis, and we cannot conclude that the parties are acting out of an ill motive with regard to either of them.

Finally, when we consider the availability of alternate means of partial custody, this is an area again that gives the Court greatest concern. Mother estimated that her new residence would be about five and a half hours away. The Court's computer calculates it to be closer to six hours. It makes it impracticable for weekend exchanges, for holiday weekend exchanges, makes it difficult to exchange custody over Christmas, and in fact we would be relegated to having fairly large blocks of time with minimal custody transfers to ease the financial burden on the parties of carrying out such exchanges. With six hours of transfer time for the child, even if the parties were to meet halfway, it still is the better part of a day spent in transit for the child, and as we said, it does not promote frequent custodial changes so that the child is able to maintain frequent contacts with the parents.

*Id.* at 302–04. The trial court then determined that even if Mother had had the burden of proof as outlined in *Gruber v. Gruber,* 400 Pa.Super. 174, 583 A.2d 434 (1990), she would have failed to sustain that burden of proving that relocation would result in a substantial improvement in the quality or her and the child's life. The court also concluded that Mother did not offer a realistic alternate means of partial custody for Father because the distance would limit frequent custodial changes. Accordingly, the relocation request was denied.

¶ 18 Mother now appeals to this Court and lists the following issues for our review:

I. Whether the lower court abused its discretion in rejecting Mother's request for permission to relocate the minor child despite finding that Father abused the Mother and subsequently violated the abuse order resulting in a finding of indirect criminal contempt?

II. Whether the lower court abused its discretion in failing to consider in its final determination Mother's primary care of the child throughout that [sic] parties' marriage and Father's anger issues?

III. Whether the lower court abused its discretion by denying [Mother's] relocation request because of testimony that children need both parents between 18 to 24 months to properly bond with both parents where Mother's request to relocate was not scheduled [t]o take place

until after the child reached the age of 24 months?

IV. Whether the lower court committed an error [of] law when determining that bonding issues took precedent [sic] over making a relocation decision based on the factors enumerated in 'Gruber' and its progeny?

V. Whether the lower court committed an error [of] law by ignoring the best interest of the child standard?

Mother's brief at 4–5.

■■■ ¶ 19 In addressing custody issues, we follow this Court's decision in *Dranko v. Dranko,* 824 A.2d 1215 (Pa.Super.2003), which states that:

Initially, we note that this Court in *Graham v. Graham,* 794 A.2d 912 (Pa.Super.2002), provides the following to guide our review of a custody order:

In reviewing custody matters, this court has stated that our scope of review is very broad. Nonetheless, a broad scope of review should not be construed as providing the reviewing tribunal with a license to nullify the fact finding functions of the court of the first instance. We have stated that an appellate court may not reverse a trial court's custody order absent a showing that the trial court abused its discretion.

*Id.* at 915 (quoting *Charles v. Stehlik,* 560 Pa. 334, 744 A.2d 1255, 1257–58 (2000)) (citations and quotation marks omitted).

"An abuse of discretion in the context of child custody does not consist merely of an error in judgment; it exists only when the trial court overrides or misapplies the law in reaching its conclusion or when its judgment is manifestly unreasonable or the result of partiality, prejudice, bias, or ill will, as shown by

the evidence of record." *Wheeler v. Mazur,* 793 A.2d 929, 933 (Pa.Super.2002). "The ultimate test is 'whether the trial court's conclusions are unreasonable as shown by the evidence of record.'" *Id.* (quoting *Silfies v. Webster,* 713 A.2d 639, 642 (Pa.Super.1998)). Moreover, "[t]he paramount concern in a child custody case is the best interests of the child, based on a consideration of all factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being." *Wheeler,* 793 A.2d at 933 (quoting *Swope v. Swope,* 455 Pa.Super. 587, 689 A.2d 264, 265 (1997)). "This determination is to be made on a case by case basis." *Wheeler,* 793 A.2d at 933.

*Dranko,* 824 A.2d at 1219. Moreover, "[o]n issues of credibility and weight of the evidence, appellate courts must defer to the findings of the trial judge who has had the opportunity to observe the proceedings and the demeanor of the witnesses." *Robinson v. Robinson,* 538 Pa. 52, 645 A.2d 836, 838 (1994).

■■■ ¶ 20 Additionally, we find *Dranko* instructive because it also implicates custody in the context of a request for relocation.

[B]ecause, this matter involves an issue of relocation, the evidence must be reviewed in light of each of the factors enunciated in *Gruber v. Gruber,* 400 Pa.Super. 174, 583 A.2d 434 (1990), which must be applied under the "umbrella of the ultimate objective of determining the best interests of the child." *Anderson v. McVay,* 743 A.2d 472, 474 (Pa.Super.1999). *Gruber* requires the court to consider:

■ the potential advantages of the proposed move and the likelihood that the move would substantially improve the quality of life for the custodial parent and the children and is not the

result of a momentary whim on the part of the custodial parent;

. . .

■ the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it; [and]

. . .

■ the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent.

*Reefer v. Reefer*, 791 A.2d 372, 376 (Pa.Super.2002) (quoting *Gruber*, 583 A.2d at 439).

*Dranko*, 824 A.2d at 1219.

■ ¶ 21 Moreover, we note that "in relocation cases where the parties have *equal shared custody,* the *Gruber* factors are applicable and should be considered as part of an overall 'best interest of the child' analysis." *Thomas v. Thomas,* 739 A.2d 206, 209 (Pa.Super.1999) (emphasis added). Lastly, we recognize that where "there was no order awarding primary custody to either parent in place prior to Mother's request to relocate, the trial court [is] compelled to scrutinize both custodial environments without favoring one over the other." *Kirkendall v. Kirkendall,* 844 A.2d 1261, 1265 (Pa.Super.2004) (quoting *Marshall v. Marshall,* 814 A.2d 1226, 1230 (Pa.Super.2002)). "Accordingly, prior to an initial custodial order, both parties share the burden of production and persuasion." *Hurley v. Hurley,* 754 A.2d 1283, 1285 (Pa.Super.2000).

■ ¶ 22 Mother's arguments in regard to her first, third and fourth issues all impact the denial of her relocation request. Accordingly, to begin we set forth Mother's arguments in connection with those three issues. Mother first argues that, although the court considered Father's physical abuse that resulted in the PFA order and the subsequent conviction for indirect criminal contempt when it awarded sole legal custody of P.G.L. to Mother, the court ignored these facts when measuring non-economic factors with regard to the relocation request. Specifically, Mother lists the incidents occurring around the time the PFA was issued, *i.e.,* the physical abuse, the statements made by Father to Mother's sister, *see supra* n. 5, and the criminal charges regarding possession of illegal weapons and marijuana. Essentially, Mother contends that these factors should have been considered as part of the relocation analysis in that distancing herself and P.G.L. from Father would affect the quality of both their lives in a positive manner.

¶ 23 Mother also argues that the court "erred by overstating the importance of Mr. Ditsky's testimony." Mother's brief at 24. She points out that, although Mr. Ditsky stated that the period between ages 18 and 24 months is critical for a parent child relationship, he acknowledged that Father and P.G.L. have already formed a solid attachment to each other, *i.e.,* an appropriate bond existed between Father and son, and that daily phone calls and pictures could ensure continued contact. Mother also notes that Mr. Ditsky refused to offer an opinion concerning relocation, stating that "[t]hat really is not my domain." N.T. Trial, 4/19/03, at 25. Furthermore, Mother contends that since the contemplated relocation would not have taken place until August of 2004, after P.G.L. would have turned two years old, "the necessity of keeping the parents in the same town simply to solidify a parent-child relationship did not exist, especially given the expert's own admission that father and son had already bonded." Mother's brief at 25.

¶ 24 Mother next argues that the trial court erred by concluding that the bonding between Father and P.G.L. "took precedence over the relocation test spelled out in 'Gruber' and subsequent appellate decisions." *Id.* Essentially, Mother contends that by concluding that parent/child bonding far outweighs any improved quality of life that could occur with a relocation, a court could never grant a relocation request that involved young children. Lastly, Mother argues that the court should have balanced the improvements in the quality of life for both her and P.G.L. brought about through relocation with the substitute visitation arrangements rather than pitting the two concerns against each other. In other words, Mother contends that the court disregarded the visitation options because no option could provide Father with the amount of time with P.G.L. that the shared custody arrangement allowed.

¶ 25 We must agree with Mother's position regarding relocation. She correctly notes that the court considered Father's abuse in relation to the legal custody issue, but failed to mention that aspect of Father's behavior when considering relocation.[6] Clearly, the court focused on the bonding issue almost to the exclusion of any other evidence presented by the parties.[7] Specifically, we note the court's statement regarding extended family, *i.e.*, "[w]hile it certainly has some advantages as far as emotional advantages, again, this is far outweighed by the requirement that both parents be available for the child on a regular basis for the child to begin forming attachments to the parents." N.T., 4/20/03, at 303. This statement does not comport with Mr. Ditsky's conclusion that Father and P.G.L. have already bonded. Nor does it take into consideration the fact that the contemplated move would occur after P.G.L. had already turned two years old. However, most important, using bonding as the reason for denying relocation for a child P.G.L.'s age sends a message that relocation for a child this age can never be an available option. This is clearly not the law.

¶ 26 The court also appears to have overlooked the fact that Mother may lose her present teaching job and will be required to move due to the foreclosure action. We also find troubling the court's following statement:

> When we look at [M]other's request, if we would grant her request to relocate, it would unfortunately create large blocks of time where the child is spending with just one or the other parent in these early formative years, which we find not to be in the child's best interests. Quite frankly, some of the testimony for [F]ather, if I were [M]other, I would be somewhat concerned about the child spending large blocks of time with [F]ather.

---

**6.** As part of the general rule relating to the award of custody, partial custody or visitation, "[t]he court shall consider each parent and adult household member's present and past violent or abusive conduct which may include, but is not limited to, abusive conduct as defined under the act of October 7, 1976 (P.L. 1090, No. 218), known as the Protection From Abuse Act." 23 Pa.C.S. § 5303(a)(3).

**7.** In addition to the trial court's previously quoted discussion of the reasons for the decision here, we note the court's following comment about P.G.L.:

> We have not identified any other factors specifically with regard to the child that would significantly impact our decision other than the age of the child and the fact that he is at the age where he's formulating attachments to both parents. That we find is the single most significant factor in this particular case.

N.T. Trial, 4/20/03, at 295.

N.T. Trial, 4/20/03, at 292. The recognition that Mother should have concerns about P.G.L.'s spending large blocks of time with Father raises questions about the child's spending smaller blocks of time with Father and even sends up a red flag about the shared custody schedule that the court ordered after denying relocation. From the court's decision, we are unable to discern exactly what the court's concerns are. This also raises a question about what Mother can do about these undefined concerns.

■ ¶ 27 The court did not definitively resolve the issue of whether or not the move would significantly improve the general quality of Mother's life, which in turn would indirectly benefit the child. Rather the court concluded that whatever improvements the relocation would make in Mother's life, it was insufficient in that the child would not have the benefit of enough bonding time with Father. This conclusion directly impacts the visitation prong of *Gruber*, which "requires that there be realistic arrangements available giving the non-custodial parent the opportunity to maintain a relationship with the child...." *Anderson v. McVay*, 743 A.2d 472, 475 (Pa.Super.1999). However, the court must keep in mind that "[a] relocation request will not be denied simply because existing visitation arrangements cannot be maintained." *Id.*

¶ 28 Here, it appears that the court began with the idea that a child of P.G.L.'s age cannot be separated from his father to the extent that would be required if the relocation was granted. Therefore, the PFA, the indirect criminal contempt conviction, the criminal charges relating to the weapons owned by Father, Mother's job offer possibly increasing her salary by more than $2,000 and the extensive family connections in the area to which Mother planned to relocate, all took a secondary position to the fact that the existing shared custody arrangement would not remain in place. It is also significant that the court overlooked the fact that the family traveled almost on a monthly basis to the area where Mother wished to relocate and where both parties had extensive family relations.

¶ 29 Based upon the above discussion, we conclude that concerning the relocation the trial court misapplied the law and fashioned conclusions that are manifestly unreasonable in light of the evidence presented. Accordingly, we reverse the trial court's order denying relocation, and we remand this matter for the formulation of an appropriate visitation schedule to commence at the time of the relocation.[8]

¶ 30 Order reversed. Case remanded. Jurisdiction relinquished.

---

**8.** In light of our decision here, we need not    address the other issues raised by Mother.