J-A26017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| T.R.R. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| E.K.B. | |
| Appellant | No. 756 MDA 2015 |

Appeal from the Order Entered on April 1, 2015
In the Court of Common Pleas of Centre County
Civil Division at No.: 2012-0629

BEFORE:  FORD ELLIOTT, P.J.E., WECHT, J., and PLATT, J.[*]

MEMORANDUM BY WECHT, J.:                    **FILED OCTOBER 26, 2015**

E.K.B. ("Mother") appeals the April 1, 2015 order that awarded primary physical custody of E.R. ("Child") to T.R.R. ("Father").  We affirm.

Mother and Father married on May 6, 2009 in Nebraska.  The parties moved to Pennsylvania because Mother believed she had a job opportunity at Penn State.  Child was born in August 2010.  On February 15, 2012, Father filed a complaint in divorce.  Mother had moved back to Nebraska with Child.  Also on February 15, 2012, Father filed an emergency custody motion.  The trial court ordered Mother to return to Pennsylvania with Child.  On May 21, 2012, the trial court cancelled the upcoming custody conference because the parties had reached a temporary agreement and were residing

_____

[*]     Retired Senior Judge assigned to the Superior Court.

together. However, the divorce still was proceeding as evidenced by Mother's request for alimony *pendente lite*.

On October 15, 2012, the court entered an interim order memorializing the parties' agreement to permit Mother and Child to relocate temporarily to Nebraska. Thereafter, on November 28, 2012, the parties entered into a marital settlement agreement and a parenting plan. They agreed to share legal custody and that Mother would have primary physical custody. Father was awarded partial physical custody, but with an irregular schedule. Father waived any objection to Mother and Child relocating to Nebraska. On December 20, 2012, the parties divorced.

On May 29, 2013, Father petitioned to modify the custody schedule to increase his periods of custody. The parties reached an agreement in which Father appeared to have more time with Child, but still followed an irregular schedule.[1]

On August 6, 2014, Mother filed a notice of relocation, indicating that she intended to relocate with Child from Nebraska to Arkadelphia, Arkansas. On August 8, 2014, Father filed a petition to modify custody, in which he

---

[1] For example, Father had custody October 10 through October 14, 2013, November 23 through December 6, 2013, January 4 through January 18, 2014, and March 1 through March 15, 2014. Father then had roughly two non-consecutive months of custody in summer 2014 and then had custody for ten days each in October and November of 2014.

- 2 -

requested primary physical custody of Child. Father also filed a counter-affidavit in opposition to Mother's proposed relocation.

On August 21, 2014, Father filed an emergency motion for custody, alleging that Mother already had relocated to Arkansas with Child without the court's permission. On that same day, the trial court awarded physical custody of Child to Father. On November 4, 2014, the parties reached an interim custody order, pending their hearing on relocation and custody, in which they agreed to share physical custody on a rotating five-week basis.

The trial court held hearings on December 22, 2014 and February 27, 2015. On the first day of the hearings, Mother testified as follows. Mother had a position as an assistant professor of psychology at Henderson State University in Arkansas. Notes of Testimony ("N.T."), 12/22/2014, at 5. Mother was Child's primary caregiver since Child's birth, providing day-to-day care while Father worked. *Id.* at 6. Mother alleged that the parties separated because Father was emotionally unstable and because he became emotionally abusive, controlling, and threatening. *Id.* at 7-13. At one point, Father informed Mother that he was seeking treatment for borderline personality disorder. *Id.* at 14-15.

Mother went to Nebraska in September 2011 to visit family and stayed there until January 2012 because of Father's mental health issues. *Id.* at 17-19. Mother returned to Pennsylvania in January 2012 because Child was scheduled for surgery. *Id.* at 19. Mother left with Child for Nebraska again in February 2012 because Father's behaviors were escalating. *Id.* at 20.

Mother left without telling Father because she was scared for her safety. *Id.* at 21. When Mother learned of the February 2012 order giving Father custody, she returned to Pennsylvania. However, Father only had custody of Child for one day before Father returned Child to Mother. *Id.* at 22. Mother moved back into Father's residence because Mother did not have a job and because Father controlled all the finances. *Id.* at 23-24.

In October 2012, Mother and Child returned to Nebraska to live with Mother's mother after the parties reached a custody agreement. *Id.* at 24. Mother had primary custody and Father had extended periods of partial custody. The parties would drive to make custody exchanges, meeting about halfway. *Id.* at 25. Mother also indicated that Father had been inflexible in making adjustments to custody exchange times and locations. *Id.* at 45-46. Mother had difficulty obtaining work in her field in Nebraska, only finding a temporary postdoctoral research position. *Id.* at 26. Mother informed Father that she was seeking work nation-wide in academia. *Id.* at 27-28. When Mother was offered and accepted the Arkansas position, she contacted her former attorney and was told that she could proceed with the move. *Id.* at 36.

When Mother informed Father of the move, he objected and said that he would not let Child move any further away than Nebraska. *Id.* at 37. Mother explained that the distance was equivalent; 1,127 miles from Nebraska and 1,113 miles from Arkansas. *Id.* at 39-40. Mother believed that the move to Arkansas would not affect Father's scheduled custody. *Id.*

at 116. However, Mother admitted that she did not provide ninety days notice. *Id.* at 81. But based upon her attorney's advice, Mother did not believe she was required to provide such notice. *Id.* at 135.

Mother was concerned about Father's mental stability and its effect upon his ability to care for Child. *Id.* at 50-51. Mother admitted to taking anxiety medication and believed that Father needed medication as well. *Id.* at 51.

Mother rents a three-bedroom house in Arkadelphia. *Id.* at 62. Child has attended pre-school at the university when Mother had custody. *Id.* at 63-64. Mother also hired a nanny to care for Child when the pre-school was not in session. *Id.* at 67. Mother regularly informs Father about what is happening in Child's life when Child is with Mother. *Id.* at 74.

M.G., Mother's mother, confirmed that Father appeared emotionally unstable in the time leading up to the parties' separation, stating that he would sob uncontrollably and corner family members to talk about his marital problems. N.T., 2/27/2015, at 6-7. M.G. testified that, in the two years that Mother and Child lived with her, M.G. observed Mother to be a caring and nurturing parent and believed that there was a strong bond between Mother and Child. *Id.* at 10. M.G. testified that Mother was scared of Father when she returned to Nebraska. *Id.* at 24.

Dr. Aneeq Ahmad, Mother's supervisor, testified regarding Mother's work hours and flexibility in scheduling. *Id.* at 37-39. Dr. Ahmad also

testified that the university was very pleased with Mother's job performance. *Id.* at 40-41.

Kelli Sanford, Child's nanny, also testified. At the time of the second hearing, Ms. Sanford typically watched Child from 8 am until noon on Mondays, Wednesdays, and Fridays, and from 3 to 7 pm on Thursdays and Fridays. *Id.* at 54. Child's preschool ran from 12:15 to 3:15 pm. *Id.* at 55. Ms. Sanford would watch Child at other times as needed. *Id.* at 54. Holly Schultz, the supervisor of Child's pre-school testified that Child is well-behaved and has made friends in her class. *Id.* at 70.

Father testified as follows. Father started taking psychiatric medicine around the age of twenty, after he was diagnosed with cancer. *Id.* at 137. He went on and off medication after that. *Id.* at 138. Father started to attend counseling regularly when he lived in Nebraska and also started taking medication for ADHD. *Id.* at 139. In May 2011, Father believed that Mother was going to leave him. After conversations in which Mother commented on his anxiety, he asked his doctor for a higher dosage of his anti-anxiety medication. *Id.* at 140. Father then experienced mood swings, anger, and other symptoms. *Id.* at 141. Father denied that he ever physically abused Mother; he admitted that he said "mean things" to Mother while he was having difficulties with his medication. *Id.* at 202, 205. At some point, Father stopped his medication and was back to normal behavior a couple of weeks later. *Id.* at 150.

Around the time that Father had problems with his medication, Mother told Father that their mutual psychiatrist discussed with her the idea that Father had a brain tumor. *Id.* at 141-42. However, Father found out that he did not have a tumor and he believed that Mother made up the whole story. *Id.* at 142. Mother believed that Father had borderline personality disorder, but he did not agree with her. *Id.* at 148-49. At the time of the hearings, Father was seeing a counselor regularly. *Id.* at 144.

Mother and Child went to Nebraska in September 2011 with Father's consent. *Id.* at 158-59. Mother and Child lived with Father through the divorce process, March through November of 2012. Then Mother and Child moved back to Nebraska and Father estimated that, for 2013, Child spent thirty percent of the time with him and seventy percent with Mother. For 2014, Father believed that Child spent roughly equal time with each parent. *Id.* at 165.

Mother told Father about the Arkansas job in late July 2014. *Id.* at 166. Father looked for employment near Mother's new home, but was unable to find anything. *Id.* at 183. Father testified that the driving time to the exchange point since Mother's move to Arkansas is two to three hours longer than to the Nebraska exchange point. *Id.* at 217.

Father anticipated Child starting kindergarten in fall of 2015 if he received primary custody. He arranged his teaching schedule to take her to and pick her up from the bus stop. *Id.* at 179. Father has supportive

neighbors who are involved in Child's life. *Id.* at 189-90. Father takes care of Child's day-to-day needs while she is in his custody. *Id.* at 192.

Father alleged that Mother has withheld information from him about childcare arrangements. *Id.* at 223-24. Father also was concerned that Mother did not tell him about her new boyfriend, I.C., who he believed was going to be moving in with Mother. *Id.* at 227, 231.

Scott Scotilla, Ph.D., a licensed psychologist, performed an evaluation on Father and testified on his behalf as follows. Dr. Scotilla met Father one time in November 2014. N.T., 12/22/2014, at 160. Father's depression, anxiety and agitation in 2011 resulted, in part, from the medication that he was taking at that time, and, when Father's medication was changed, he saw an improvement in his symptoms. *Id.* at 170-73. Dr. Scotilla opined that Father did not have borderline personality disorder, but, instead, had difficulty with interpersonal relationships. *Id.* at 177-80. Dr. Scotilla also indicated that his testing did not show any indications that Father was struggling with anxiety or depression. *Id.* at 183. However, based upon Father's past history, Dr. Scotilla diagnosed Father with generalized anxiety disorder that was in remission. *Id.* at 186. At the time of the hearing, Father was taking a mood stabilizer and had been since 2011. *Id.* at 197. He had stopped taking medication for ADHD in 2014. *Id.* at 199.

P.R., Father's mother, testified. P.R. testified that the parties had difficulties in their marriage after Child was born and that she heard arguments between them. N.T., 2/27/2015, at 80-82. P.R. reported that

she flew to Pennsylvania in January 2012 because Mother told her that Father's doctor suspected that Father had a brain tumor and that Mother needed help with Child while Father was seeking treatment. *Id.* at 84. Father did not have a tumor, but P.R. stayed to visit with the family. While P.R. was visiting in January 2012, Father was taking psychiatric medication and P.R. admitted that it appeared to cause unusual behavior in Father. *Id.* at 86. P.R. testified that Father is a loving parent and engages in a lot of activities with Child. *Id.* at 88-89.

R.T., Father's sister also testified. R.T. recalled an incident in 2011 when Mother and Father were arguing and Mother grabbed Father's arm to prevent him from leaving and pulled him toward her. R.T. did not believe Mother hurt Father. *Id.* at 108-09. R.T. had no concerns about Father's ability to parent Child. *Id.* at 116.

On rebuttal, Mother denied that she told Father that he had a brain tumor. *Id.* at 287. Mother testified that her psychologist speculated that Father's behavioral issues might have a physical, rather than psychological, cause; Mother shared that idea with Father. *Id.* at 287-88. Mother testified that she met I.C. through a single-parent website about a year before the hearing. *Id.* at 288. I.C. lived in Canada so he had only met Child twice. *Id.* at 289-90. I.C. came to Pennsylvania to see Mother while the hearing was occurring and Mother invited Father to meet I.C. *Id.* at 289. Mother testified that I.C. does not live with her and there are no plans for him to do

so. *Id.* at 291. I.C., with two exceptions, had only visited Mother when Child was in Father's custody. *Id.* at 297.

On April 1, 2015, the trial court entered its order. The trial court detailed its weighing of the factors pursuant to 23 Pa.C.S.A. § 5328(a) ("custody factors") and § 5337(h) ("relocation factors"). Following its discussion, the trial court denied Mother's request for relocation and granted Father's motion to modify custody. The court ordered shared legal custody, awarded Father primary physical custody, and awarded Mother custody in Arkansas for every summer vacation and spring break, in addition to alternating Thanksgiving and Christmas holidays.

On April 30, 2015, Mother filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On May 1, 2015, the trial court filed an opinion pursuant to Pa.R.A.P. 1925(a), in which it incorporated its April 1, 2015 opinion and order.

On appeal, Mother raises the following issues for our review:

1. Based upon the evidence and testimony at [the] hearing, and the factors to be considered in [23 Pa.C.S.A. § 5328(a)], did the Trial Court abuse its discretion by failing to confirm primary physical custody of [Child] to [Mother]?

2. Did the Trial Court abuse its discretion by requiring [Mother] to file a Notice of Relocation and immediately changing physical custody without providing [Mother] with an opportunity to be heard at her two-day trial?

3. Did the Trial Court abuse its discretion in applying factors located in Pennsylvania's Child Custody Relocation Statute, [23 Pa.C.S.A. § 5337(h)] to the instant case, because

relocation is defined by [23 Pa.C.S.A. § 5322] as "A change in residence of the child which significantly impairs the ability of a non-relocating party to exercise custodial rights," and such relocation as defined by Sec. 5322 was not present in this case?

Mother's Brief at 5.

Our scope and standard of review of a custody order are well-settled:

> [O]ur scope is of the broadest type and our standard is abuse of discretion. This Court must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, this Court must defer to the trial judge who presided over the proceedings and thus viewed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.
>
> **E.D. v. M.P.**, 33 A.3d 73, 76 (Pa. Super. 2011) (citation omitted). With any child custody case, this Court has long stated that the paramount concern is the best interests of the child. **Landis v. Landis**, 869 A.2d 1003, 1011 (Pa. Super. 2005). This standard requires a case-by-case assessment of all of the factors that may legitimately affect the "physical, intellectual, moral and spiritual well-being" of the child. **Id.** When a custody dispute involves a request by a party to relocate, we have explained, "there is no black letter formula that easily resolves relocation disputes; rather, custody disputes are delicate issues that must be handled on a case-by-case basis." **Baldwin v. Baldwin**, 710 A.2d 610, 614 (Pa. Super. 1998).

**C.M.K. v. K.E.M.**, 45 A.3d 417, 421 (Pa. Super. 2012).

In its order, the trial court denied relocation and changed the physical custody schedule for the parties. When addressing both relocation and custody, a trial court is required to consider all of the relevant custody factors enumerated in 23 Pa.C.S.A. § 5328(a), and all of the relevant relocation factors pursuant to 23 Pa.C.S.A. § 5337(h). *See A.V. v. S.T.*, 87 A.3d 818, 822-23 (Pa. Super. 2014). The factors are as follows:

**(a) Factors. –** In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where

reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328.

**(h) Relocation factors. –** In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337.

In her first issue, Mother asserts that the trial court failed to consider certain testimony, made factual findings unsupported by the evidence, and/or mis-weighed the custody factors in section 5328(a). Mother argues that the trial court ignored testimony that Mother was the primary caretaker for the majority of Child's life and then made a factually incorrect finding that both parents had performed parental duties, especially since Father provided little testimony regarding his performance of parental duties.

Mother's Brief at 21-22. Mother also contends that the trial court incorrectly determined that the need for stability weighed more favorably for Father because Mother was the primary caretaker. Mother asserts that she had witnesses who testified about childcare and other opportunities in Arkansas, while Father did not have similar witnesses. *Id.* at 22-23. Mother argues that the availability of extended family factor should have weighed more favorably toward Mother since Father's and Mother's extended family are closer geographically to her than they are to Father. *Id.* at 23-24. Mother also contends that the evidence did not support the trial court's conclusion that she withheld information from Father. Instead, Mother asserts that she provided Father with information about her move and childcare arrangements as soon as possible and that she did not need to disclose her relationship with I.C. because he was not a significant part of Child's life. *Id.* at 24-28. Finally, Mother argues that the trial court's decision was based upon her failure to provide the statutory notice of her relocation, her contention that Father had a brain tumor or borderline personality disorder, and her failure to inform Father about her boyfriend, none of which, Mother contends, influence Child's best interest. *Id.* at 29-31.

We disagree. First, the trial court did not discount Mother's role as primary caretaker. The court acknowledged that Mother was the primary caretaker while the parties were married. Trial Court Opinion ("T.C.O."), 4/1/2015, at 2. The trial court also noted, and the testimony supported, that, after Mother returned to Nebraska, both parties were the primary

- 15 -

caretaker "for their period of custody." *Id.* Father had significant periods of custody of the relatively young child after Mother moved. It is true that, sometimes, Father's family visited or he visited his family during his periods of custody, there was no evidence offered that demonstrated that anyone other than Father met Child's day-to-day needs for these extended periods of time. Mother takes issue with the trial court's characterization of the parties as "sharing custody." However, the trial court did not suggest that custody was shared equally, only that both parties exercised physical custody. Even before the most recent custody litigation was initiated, Child was spending periods of a month or more with Father.[2] Again, there was no indication that Father was incapable of caring for Child, except for Mother's contention that Father's psychiatric issues possibly could recur.

As for stability and continuity, the trial court found that Child "has spent more time in State College than in Arkansas." *Id.* at 4. Objectively, that is true. Child had been in State College, at least part-time, since birth. Child had only been in Arkansas for approximately thirteen weeks. Mother and some of her witnesses testified that Child had adjusted well to Arkansas. However, Father testified that Child had attended the same pre-school in Pennsylvania, that Child would attend kindergarten with some of the children

_____

[2] *See* Parenting Plan, 11/28/2012, at 4 (as an example, "Father shall have custodial time with the child in Pennsylvania from May 5, 2013 to June 24, 2013.").

from her pre-school class, and that Child had ties to the community. Additionally, the fact that Mother provided witnesses beyond her own testimony does not mean the trial court had to give more weight to that testimony. The trial court was free to credit Father's testimony without corroborating witnesses. There was plenty of evidence in the record to support the trial court's conclusion that this factor weighed in favor of Father.

The trial court found that the availability of extended family factor did not favor either parent. *Id.* at 4. The evidence supports this conclusion. Father's extended family was in Louisiana, approximately six hours from Mother and twenty-four hours from Father. Mother's extended family was in Nebraska, approximately twelve hours from Mother. Clearly, neither party has extended family who could respond quickly to an emergency situation or provide day-to-day support. However, both parents testified to friends, neighbors, and colleagues who offer support and could provide emergency care for Child if needed. The trial court's conclusion that this factor was in favor of neither parent was supported by the record.

Finally, the trial court, in consideration of level of conflict and cooperation and the catch-all factor, found that Mother "has shown an unwillingness to share important information with Father." *Id.* at 6, 9-10. As examples, the trial court noted Mother's failure to inform Father of her move, about childcare providers, and about her boyfriend. *Id.* While Mother has denied withholding information, testimony, credited by the trial

- 17 -

court, supports the court's conclusions. Mother provided an explanation as to why she did not tell Father about the relocation at the earliest possible time, but the evidence demonstrates that Mother and Child moved without Father's consent when Father shares legal custody, and without waiting for court approval after Mother knew of Father's objections. When confronted with an email sent in October 2014, two months after the move, Mother admitted that she did not tell Father about her childcare arrangements immediately. Finally, the evidence demonstrated that Father became aware of Mother's boyfriend through Child, indicating that Child had met and interacted with I.C. prior to Mother disclosing him to Father. While Mother contends that this did not affect Child's best interest, we will not second-guess the trial court's finding that it is indicative of a pattern of behavior by Mother when the record provides support for that finding.

> We consider that:
>
> [i]t is not this Court's function to determine whether the trial court reached the "right" decision; rather, we must consider whether, "based on the evidence presented, given due deference to the trial court's weight and credibility determinations," the trial court erred or abused its discretion in awarding custody to the prevailing party.

*Jacob v. Shultz-Jacob*, 923 A.2d 473, 479 (Pa. Super. 2007). Here, the trial court's findings of fact and consideration of the custody factors are supported by the record and it did not abuse its discretion.

Mother next contends that the trial court did not comply with Pa.R.C.P. 1915.4(d), which requires the trial court to issue a decision within fifteen

- 18 -

days of the conclusion of a trial and 23 Pa.C.S.A. § 5425(a), which requires notice and an opportunity to be heard. Specifically, Mother argues that, by granting Father custody in an *ex parte* August 2014 order, the trial court created a false status quo that influenced its decision on custody. In particular, Mother cites the trial court's language that the parties "shared custody." Mother asserts that it was error for the trial court to enter an emergency order changing custody, then wait several months to hold a hearing, and then delay further until an order was entered. Mother's Brief at 31-34.

We first address Mother's contention that the trial court unduly delayed its decision. Rule 1915.4 provides, in pertinent part, that:

> The judge's decision shall be entered and filed within 15 days of the date upon which the trial is concluded unless, within that time, the court extends the date for such decision by order entered of record showing good cause for the extension. In no event shall an extension delay the entry of the court's decision more than 45 days after the conclusion of trial.

Pa.R.C.P. 1915.4(d).

In her account of a thirty-plus day period between the second day of the hearing and the court's order, Mother neglects to mention that the trial court offered the parties the opportunity to provide the court with briefs and proposed findings of fact and conclusions of law. N.T., 2/27/2015, at 300. Mother's counsel deferred to Father's counsel's decision on the issue. *Id.* Father's counsel asserted that he wanted to file findings of fact and requested twenty days to do so. *Id.* at 301. Mother did not object. The

- 19 -

trial court memorialized that agreement in a February 27, 2015 order. Therefore, although the hearing ended on February 27, the record did not close until twenty days later when the parties submitted what were essentially written closing arguments. Both Mother and Father took advantage of that opportunity, with Mother and Father filing their proposed findings on March 19, 2015. The court's order followed thirteen days later. Therefore, we find no violation of Rule 1915.4.[3]

Next, Mother contends that the trial court violated 23 Pa.C.S.A. § 5425 by not providing her notice and the opportunity to be heard before ruling on Father's emergency custody petition. We first note that section 5425 in Chapter 54 of the Domestic Relation Code relates to the Uniform Child Custody Jurisdiction and Enforcement Act, which provides the statutory scheme for determining which court has jurisdiction to enact and enforce custody orders. However, jurisdiction was not at issue in this case and it proceeded under Chapter 53, Child Custody, of the Domestic Relations Code. Therefore, section 5425 was not applicable.

We have held that due process is satisfied when an *ex parte* order is entered, but is then followed by a hearing and an opportunity to be heard.

_____

[3]    Had there been a violation, it is unclear what remedy would be available. We can find no decisional law that addresses this issue. Other provisions of Rule 1915.4 call for dismissal of a complaint if time limits are not complied with, but subsection (d) provides for no explicit remedy. Requiring a new trial or vacatur of an order, as Mother suggests, would result in judicial inefficiency and further delay finality in the custody case.

*Smith v. Smith*, 371 A.2d 998, 1000 (Pa. Super. 1977). Further, our rules contemplate that emergency or interim orders sometimes must be entered. *See* Pa.R.C.P. 1915.4(e) ("Nothing in this rule shall preclude a party from seeking, nor a court from ordering, emergency or interim special relief at any time after the commencement of the action."). We find no error in the court entering a temporary order in response to Father's emergency petition.

Mother also complains that the delay between the temporary order and the final order created a status quo that influenced the trial court. The trial court entered its emergency order on August 21, 2014 and scheduled a conference on September 1, 2014. Father requested a continuance. The conference was held and resulted in a September 10 order which scheduled a one-day hearing for October 31, 2014. The hearing was then rescheduled until December 22, 2014 after Father requested a continuance because his counsel sought to withdraw. When the parties were unable to finish the hearing in one day, a second day was scheduled for February 27, 2015. Ideally, the hearings would have been concluded closer in time to the petition being filed. However, there was no undue delay and no indication that any delay was not due to scheduling availability. Further, there is no evidence that the equally shared custody during the pendency of the petition influenced that trial court's decision. We find no error.

Finally, Mother argues that the trial court erred in treating this as a relocation case and applying the relocation factors. Mother contends that a relocation, as defined by statute and by the parties' agreement, constituted

any move that required a change in custody. Mother argues that, because the distance between Arkansas and Pennsylvania substantially was the same as the distance between Nebraska and Pennsylvania, her move to Arkansas did not require a change in Father's custody and, therefore, was not a relocation. Mother also complains that some of the facts that the trial court cited in its relocation analysis should have been considered as part of its analysis of the custody factors, namely that Mother's move enhanced her quality of life by providing her with secure employment and that Mother had a better financial position in Arkansas. Finally, Mother argues that her failure to provide ninety days notice of her move should not be held against her because she acted reasonably by seeking her attorney's advice and notifying Father as soon as possible. Mother's Brief at 34-37.

Mother is correct that the statute defines relocation as "[a] change in a residence of the child which significantly impairs the ability of a nonrelocating party to exercise custodial rights." 23 Pa.C.S.A § 5322(a). However, the parties agreed to a different definition in their parenting plan, which the court entered as an order. The parties agreed that "[n]either party shall permanently relocate if the relocation would necessitate a change in the parenting plan without a minimum written notice of ninety (90) days to the other parent." Parenting Plan, 9/3/2013, ¶11. The plan also set the parties' exchange location as South Bend, Indiana. *Id.* ¶ 4. Therefore, Mother's move "would necessitate a change in the parenting plan" because the exchange location of South Bend would no longer be viable. Therefore,

by the terms of the parties' agreement, Mother's move was a relocation and the trial court did not err in treating it as such.[4]

Mother's argument that the trial court should have considered factors related to relocation, such as her quality of life and financial position, as part of the custody determination is without merit. The trial court obviously considered these factors in making its custody decision. Whether it stated its consideration was in regards to custody or relocation is without moment. The trial court weighed the evidence and found in favor of Father. There was no abuse of discretion that would permit us to interfere with that determination.

Finally, Mother argues that the failure to provide ninety days notice should not be held against her because she acted reasonably under the circumstances. There is nothing in the record to suggest that the trial

_____

[4] Further, even if the trial court erred in applying the relocation factors, we have stated that:

> [S]everal of the relevant factors of section 5337(h) are encompassed, directly or implicitly, by the custody factors listed in section 5328(a). Any relevant section 5337(h) factor that is not expressly encompassed in section 5328(a) should be considered by the trial court under the catchall provision of section 5328(a)(16).

***D.K. v. S.P.K.***, 102 A.3d 467, 478 (Pa. Super. 2014). As the relocation factors would be either encompassed by the custody factors or considerations in the catch-all provision, it would have been, at most, harmless error for the trial court to explicitly consider the relocation factors had we determined that this was not a relocation case.

court's decision hinged upon Mother's failure to provide notice. At most, the trial court considered that failure in its larger characterization of Mother's pattern of withholding information. Mother provided her reasoning for not notifying Father about her move. The trial court considered that rationale, but did not find it persuasive. Such a determination is within the trial court's purview, and, without more, we find no abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/26/2015