J-S12019-18

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.F. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| B.A. | : | |
| | : | |
| Appellant | : | No. 1850 MDA 2017 |

Appeal from the Order Entered, November 14, 2017,
in the Court of Common Pleas of Mifflin County,
Civil Division at No(s):  2017-00783.

BEFORE:  LAZARUS, J., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED MAY 21, 2018**

B.A. ("Mother") appeals from the order transferring primary physical custody of the parties' nine-year-old daughter, O.F., from Mother to J.F. ("Father").  Because we conclude that the evidence does not support the trial court's custody modification, we are constrained to reverse.

We glean from the record and testimony the following facts:

The parties are parents of two daughters, 16-year-old Je.F. and 9-year-old O.F., though only O.F. is the subject of these proceedings. The parties separated in August 2012.  From August 2012 to around August 2015, the girls lived primarily with their Mother in Blair County and spent partial custody with their Father in Huntingdon County.  In September 2013, this arrangement was reduced to writing via a mutually agreed upon "custody stipulation" which was then transformed into a custody order.  The parties agreed that legal

custody would be shared, that Mother would continue to be the primary custodian, and that Father would continue to enjoy partial custody on alternating weekends. The parties also shared summers on a week-on-week-off basis.

In 2015, however, prior to starting high school, Je.F. expressed her wish to live primarily with Father, evidently after an ongoing strained relationship with Mother. Mother acquiesced and Je.F. has resided in Father's primary custody ever since. The parties live in neighboring counties a little over an hour away from each other. Je.F.'s custody arrangement with her parents flipped, but the schedule was coordinated such that both girls spent every weekend and every summer together.

The most recent litigation between the parties began in June 2017 when Father petitioned to modify custody of the parties' nine-year-old daughter, O.F. His petition, filed in neighboring Huntingdon County, was precipitated by the fact that Mother and O.F. had just moved for approximately the fifth time since the parties' separation; this time the child also transferred to the school where Mother is a principal. Father's stated rationale for the litigation was that the girls should be together, and that he could provide O.F. a more stable environment. For reasons that are unclear, Father's petition to modify custody was transferred from Huntingdon to Mifflin County.[1] The previous court had appointed Erica Shoaf, Esq. as guardian *ad litem* ("GAL") on behalf of both

---

[1] Presumably, Father had moved from Huntingdon to Mifflin since the case was last court-active.

O.F. and Je.F. In June 2017, prior to the transfer of the case, the GAL issued her report, recommending that Mother retain primary custody of O.F. The GAL was retained by the Mifflin County court and the report was made part of this record. The parties appeared for a custody hearing in the Mifflin County Court of Common Pleas on September 21, 2017.

The trial court first conducted *in camera* interviews with Je.F. and O.F. While the children's testimony was made a part of the record, a letter that Je.F. wrote to the court was not. The trial court heard only three additional witnesses: Mother, Father, and Father's wife. Neither party proffered any other evidence except their witnesses' testimony. After taking the matter under advisement, the trial court issued an interim order and Findings of Fact, both dated October 19, 2017. The Court granted Father's petition, and awarded him primary physical custody of O.F., with Mother enjoying partial custody on alternating weekends. While all legal custody was to be shared, the implicit understanding was that O.F. would leave her school to attend one in Father's district.

Mother presented two post-trial motions. She first sought the trial judge's recusal after Mother discovered that the judge knew Father's wife; both are active in the local youth basketball community. The trial judge explained that while he knew of the wife, he did not know her as anything more than an acquaintance, and he denied the motion to recuse. Mother also asked for reconsideration of the custody decision. She specifically argued that while the trial court was not bound to follow the GAL's recommendation, it

was obligated to articulate the reasons why it did not. This relief was also denied.[2] The temporary order changing primary custody was changed to a final order, effective November 14, 2017. Mother presents to us this timely appeal.

Mother raises the following claims:

1. Whether the trial court erred and abused its discretion in failing to recuse himself?

2. Whether the trial court erred and abused its discretion in finding it was in the child's best interest to change primary custody from Mother to Father?

3. Whether the trial court's failure to address the recommendation of the guardian *ad litem* was a misapplication of the law?

Mother's Brief at 5.

We begin our analysis with the main issue Mother raises on appeal, whether the trial court's modification of the long-standing custody arrangement was in O.F.'s best interests. We hold that it was not.

Our scope and standard of review of child custody orders are settled:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first hand. However, we are not bound by the trial court's deductions or inferences

---

[2] The trial court did grant one aspect of Mother's request. The trial court ordered Father to take O.F. to an intake counseling session to determine whether future counseling would be appropriate.

from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

The potential harm that may result from the disruption of established patterns of care and emotional bonds underscores the need for continuity, stability, and finality imparted to custody arrangements. *Jackson v. Beck*, 858 A.2d 1250, 1252 (Pa. Super. 2004). A modification of custody is not warranted merely because one parent is unhappy with the existing arrangement. *Id.* Thus, we repeatedly have emphasized that a party requesting modification must prove that the alteration of an existing custody arrangement is in the child's best interest. *Id.* (*citing McMillen v. McMillen*, 602 A.2d 845 (Pa. 1992)).

When a trial court orders a form of custody, the best interest of the child is paramount. *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014) (citation omitted). Section 5338 of the Custody Act (23 Pa.C.S.A. §§ 5321 – 5340) provides that, upon petition, a trial court may modify a custody order if it serves the best interests of the child. Section 5328(a) sets forth the best interest factors that the trial court must consider:

In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by

another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a). Trial courts are required to consider all of the factors listed in Section 5328(a) when entering a custody order. *J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011); *see also C.A.J. v. D.S.M.,* 136 A.3d 504 (Pa. Super. 2016)(holding that the trial court was required to consider Section 5328(a) factors when modifying a custody award).

In analyzing these factors, the trial court's main reason for switching primary custody from Mother to Father was the subject child's relationship with her older sibling. *See* Findings and Discussion*,* 10/19/17, at Factor 6. One of the reasons Father requested modification of the custody order was that he wanted his daughters to live together.[3] *See* N.T., 9/27/17, at 90. In the conclusion section of its Findings and Discussion, the trial court stated that both parents are capable of providing the physical, mental and emotional well-being of O.F. *See* Findings and Discussion*,* at Factor 10. "However, given the importance this Court places on the relationship between the minor child and her oldest sister and the importance of fostering that relationship this court believes primary physical custody should be with Father." *See id.,* at

---

[3] Father's other stated reason, that O.F. had previously expressed a desire to live with him, is discussed in detail, *infra.*

Factor 8.  Apart from its Findings and Discussion, submitted simultaneously with its custody order, the trial court provided no further elaboration of its rationale for changing the parties' long-standing, mutually agreed upon custody order until Mother filed a motion for reconsideration.  When denying the motion for reconsideration, the trial court reiterated that its decision "relies heavily" on the *in camera* interview with the older sibling, Je.F.  **See** N.T. 11/14/17, at 29.  The trial court declined to agree entirely with Mother's summation that the court's decision "ultimately rests on the relationship of the older sister." **Id.**, at 30.  The trial court stated: "[The sibling relationship is] one of the factors.  In my opinion it's a factor and it was a big factor." **Id.**

In the past, we have stated it is the policy of this Commonwealth that, where possible, siblings should be raised together absent "compelling reasons" to do otherwise. **L.F.F. v. P.R.F.,** 828 A.2d 1148, 1152. (Pa. Super. 2003) (**citing Watters v. Watters,** 757 A.2d 966, 969 (Pa. Super. 2000)). "However, this policy is a consideration in, rather than a determinant of, custody arrangements." **See L.F.F.,** 828 A.2d at 1152-1153; 1154 (affirming the trial court's determination that compelling reasons existed to maintain the *preexisting separation* of the siblings) (emphasis added).  These cases predate the enactment of the current Child Custody Act.  Their holdings retain persuasive value, but Section 5328(a) does not require a court to presume siblings should be raised together; this "policy" has been assimilated into Section 5328(a)(6). **See e.g. P.J.P. v. M.M.,** 2018 Pa. Super. 100, 2018 WL 1979832, (Pa. Super. April 27, 2018) (holding that the shared custody factors

set forth in **Wiseman v. Wall**, 718 A.2d 844, (Pa. Super. 1998), assimilated into the custody factors set forth in 23 Pa.C.S.A. § 5328(a)).

In this case, the trial court abused its discretion when it placed such a disproportionate weight on the sibling relationship in light of the available evidence as to both Section 5328(a)(6)(the sibling relationship) as well as the other 15 enumerated custody factors in 23 Pa.C.S.A. § 5328(a).

The children have an age difference of seven years and four months. They lived in Mother's primary care since the date of separation in August 2012 until the older Je.F. moved into Father's home in the summer of 2015, a little over two years before this custody trial. Despite the age difference, the record reflects that the children are close. Je.F. is protective of her younger sister, O.F.; O.F. cried when Je.F. went to live with Father. But the girls have been able to maintain a close relationship in the years since Je.F.'s move, because the custody arrangement has afforded them time together every weekend and every summer. Moreover, the trial court placed no weight on the fact that Je.F. will graduate from high school in two years and may pursue higher education possibilities. Thus, Je.F. may leave home shortly, at which point O.F. would still only be 11. While the siblings would spend more time together if Father was awarded primary custody of O.F., it cannot be said that their relationship would be so much more enriched that it outweighs all of the other custody considerations when determining O.F.'s best interests.

The trial court found that Je.F. could provide the younger O.F. "a stable, loving, and continuing emotional presence in the minor child's life," and "Je.F.

could act as a positive mentor for her younger sister given her work ethic and involvement in extracurricular activities." **See** Findings and Discussion, 10/19/17, at Factor 6. But the record simply does not reflect that O.F. is in need of stability or motivation. Both children are on the honor roll. Both children engage in extracurricular activities. Testimony revealed that the stress of the litigation had caused O.F. anxiety. At Mother's insistence, despite Father's skepticism, O.F. began therapy shortly before the hearing. Mother reported that this therapy has been very beneficial. Despite credible allegations that one or both parents were at fault, the trial court avoided laying blame for the child's emotional distress at the feet of either parent. On the contrary, the trial court found that both parents could provide for the child's emotional well-being. **See** Findings and Discussion, 10/19/17, at Factor 10. The trial court did not find, nor does the evidence suggest, that O.F. was in want of emotional stability while in her Mother's care.

In fact, when deciding Section 5328(a)(6)(sibling relationship), the trial court seemed to place less emphasis on the actual sibling relationship, but rather placed considerable weight on Je.F.'s *in camera* discussion of Mother's shortcomings as a parent. The trial court inferred that because Mother's use of corporal punishment with Je.F. had adversely affected their relationship, the same fate might befall O.F. During the motion for reconsideration, the trial court explained:

> I interviewed [Je.F.] in the back with the GAL and with my law clerk just simply to get a view of the landscape, and there is some discussion in here regarding allegations of

- 10 -

> past abuse indicating that it was of testimony that they got that. **And that is where I reviewed my notes and specifically on cross examination of [Mother,] it was brought up that [Je.F.'s] perception is that mom was violent with her in the past. Mom indicated she wasn't aware of that. And she said, well, [Je.F.] feels that you did X, Y, and Z. Mom denied it, but she indicated that's [Je.F.'s] perspective? Yes. That's where I kind of went to the unofficial record to say that was where I got that information. It was from nothing that was said by [Je.F.] in the past** because I said to [Je.F.] when I talked to her, look, I'm not going to run out and say [Je.F.] said X, Y, or Z. That's not what I do. I just wanted to get a picture of the landscape to get a better idea of what I'm looking at in advance of this.

N.T., 11/14/17, at 29-30 (emphasis added); *see also* N.T., 9/27/17, at 203.

To be clear, it appears that the trial court did not make findings of abuse. In its discussion of 23 Pa.C.S.A. § 5328(a)(2)(pertaining to abuse), the trial court only noted the allegations that Je.F. made during her *in camera* interview:

> This Court heard testimony alleging past abuse of the parties' oldest daughter, [Je.F.], by Mother. Although Mother did not admit to any past abuse of [Je.F.], and acknowledged only that their relationship is strained, these allegations of abuse are very concerning to this Court. Further, Mother admitted that her relationship with Father was contentious and that both parties were abusive towards one another prior to their separation. Nevertheless, Mother expressly denied all allegations of abuse against the minor child in this present case.

*See* Findings and Discussion*, 10/19/17, at Factor 2.

In her *in camera* interview, Je.F. and the trial court engaged in the following pertinent dialogue:

> Je.F.:

- 11 -

Growing up she used to hit me and stuff, and she was really mean. And I understand that she had a lot of stress on her and stuff, but I guess sometimes parents should find a way to control it around their children, and she never did.

THE COURT:

And I don't want to bring up stuff in the past, but, I mean, you meaning normal smack your butt when you did something wrong when you were 8?

Je.F.:

No.

THE COURT:

Or what you thought over the line abusive stuff?

Je.F.:

Yeah.

THE COURT:

That's fine. You don't have to get into it, but you think there is still a concern there with [O.F.]?

Je.F.:

Yeah, it does concern me. And like I don't think my mom is a terrible mom. I'm not saying that by any means because she is my mom, she is the only mom that I'll ever have, but what she does concerns me, and I don't think that it's the greatest at some times. And I'm not going to sit here and let her do it when I know that there is stuff that I could do to prevent it. And I just, I'm afraid that [O.F.] will come in here - - and she is beyond nervous.

THE COURT:

I'm sure.

Je.F.:

She is just - - I don't want her to come here and feed a line of crap because she gets - - when she is nervous, she does that, and I'm afraid that she'll do that. I told her just be honest. If he asks what your favorite color is, just tell him.

And she said I know, I know, but she can say I know all she wants. I know her well enough that she might make something up because she doesn't want to hurt my dad's feelings or my mom's feelings.

N.T., 9/27/17, at 10-11

On the subject of corporal punishment and abuse, the GAL wrote in her report that Mother admitted to smacking Je.F. across the mouth several years ago, when Je.F. told Mother that she hated her. Je.F. told the GAL that Mother hits O.F., but not in the same way that Mother used to hit Je.F. Je.F. also reported that Mother screams at her a lot when they are at her house. Je.F. felt that Mother is not nurturing enough to O.F., and will push her away when O.F. is looking for affection.

Mother also admitted to hitting O.F. in the back with a hairspray bottle. O.F. said she was getting ready in the morning when O.F. spilled lotion on her stepsister.[4] She reported that Mother got mad at her and smacked her with the bottle. O.F. reported that it hurt until the next day, but that there was no bruise. Mother's version is that the kids were dawdling in the bathroom, and while telling them to get ready, Mother, with bottle in hand, accidently hit O.F.

---

[4] The maternal stepsister, L. (last name undisclosed), is the daughter of Mother's husband; her husband exercises shared custody of L. on alternating weeks. L. and O.F. have been in each other's lives since L. was 1 year old and O.F. was 3 years old. The trial court did not consider this relationship, nor the relationship O.F. has with her paternal stepsisters Ja. and La. who reside with Father for an unspecified amount of time. We note that the comment to section 5328 provides that "[s]ubsection (a)(6) is intended to include full-blood siblings, half-blood siblings, step-siblings and adoptive siblings. 23 Pa.C.S.A. § 5328, comment (2010).

- 13 -

when she was using her hands for emphasis. Mother reported that she might spank O.F. on the bottom when she misbehaves, but it is often not necessary.

The GAL concluded that while the use of physical discipline was concerning, O.F. did not report any instances of physical discipline other than the hairspray bottle incident and did not report any fear of Mother. The GAL noted that Je.F. is thriving while living with Father, and that she would benefit from counseling with Mother to address their strained relationship. However, the GAL recommended that O.F. continue to live primarily with Mother. During Mother's cross-examination, it was revealed that Mother had tried to engage in counseling with Je.F., but Je.F. has refused. *See* N.T., 9/27/17, at 203-204. Mother said she understood that Je.F. did not presently wish to have a relationship with her. [5] *Id.* at 203.

Ample evidence indicates that Father has been a considerably better placement for the teenaged Je.F. She has said herself that she responds well to his strict rules, which have provided the structure she needs. *Id.* at 15. The GAL concluded that Je.F. is thriving in Father's care. To Mother's credit, she acknowledged that it is in Je.F.'s best interests to remain in Father's primary care.

We are not bound by the trial court's deductions or inferences from its factual findings. *C.R.F.,* 45 A.3d at 443. As such, we do not adopt the trial

---

[5] It might appear, based on this testimony, that the daughters would not actually spend every weekend together if O.F. remained in Mother's custody. However, in fashioning the modified custody order, the trial court anticipated that Je.F. would still honor Mother's partial custody time. As such, we find no reason to conclude otherwise.

court's apparent inference that Mother's parenting methods, which have clearly produced a strained relationship between Mother and Je.F., would also produce a negative relationship between Mother and O.F. The evidence does not support this conclusion, nor does it support generally a departure from the previously agreed upon status quo. Rather, ample evidence suggests that Mother has changed her parenting style, largely refraining from physical discipline, to the benefit of O.F. It is apparent that all parties have matured in the years since the post-separation turmoil. The bond between siblings who must endure custody litigation, especially acrimonious litigation, stands to be as vital as any consideration in the best interests spectrum. But the bond between these siblings is already strong and would not be so much better served as to outweigh the rest of the analysis. The trial court reached its conclusions regarding the sibling relationship largely based on the relationship between Mother and Je.F. We do not adopt this inference.

Similarly, in its discussion of Section 5328(a)(4), the trial court also cited the strained relationship between Mother and Je.F. as evidence for O.F.'s apparent need for stability. *See* 23. Pa.C.S.A. § 5328(a)(4) (relating to the need for stability and continuity in the child's education, family life and community life). The court noted the success Je.F. has achieved since she moved in with her Father. The trial court noted Je.F.'s "maturity," "strength of character," and her ability to maintain good grades while balancing a part-time job and extracurricular activities. *See* Findings and Discussion, 10/19/17, at Factor 4. While perhaps it was evident that Je.F. was in need of

- 15 -

this stability prior to her move with Father, we do not share the trial court's inference that the same is true of O.F.

The trial court also noted a secondary reason why O.F.'s current life with Mother lacked stability and continuity; the trial court placed considerable weight on the fact that O.F. and Mother have moved several times in recent years:

> Since 2012, Mother has changed residences approximately five times. While Mother's initial change in residence was the result of a fire and was therefore beyond her control, the subsequent changes in address were not. Such frequent changes in address and school systems inevitably affects the stability and continuity of the minor child's education and community life. While awarding Father primary custody would necessitate yet another move for the child, this Court believes Father offers a more stable environment based on his less frequent changes in residence.

*Id*.

We do not share the trial court's inference, because Mother's moves were justified and did not cause the disruption the trial court presumed. Mother testified that her first move was from the parties' joint residence to an apartment above a flower shop, which she was forced to leave after a fire. *See* N.T., 9/27/17, at 143. From there, she and the children moved into her grandmother's house until she could secure an apartment in the area where they had previously resided. *Id.* at 144. Mother decided to wait out the school year instead; Mother was a teacher and O.F. was enrolled in pre-school where the grandmother lived. *Id.* Mother then moved back to Altoona, where she lived before the fire, and found a place on 5th Avenue. *Id.* at 144-46. Mother

lived there with the children for two years, before moving with her husband to a residence on Baynton Avenue. *Id.* at 146. She lived there for another two years before she and her husband purchased a home. *Id.*

We note that O.F.'s education was largely uninterrupted by the moves. The child was enrolled in first, second, and third grade in the same school where Mother also taught. *Id.*, at 148. For fourth grade – the grade she was in during the subject custody litigation – the child followed Mother to a new school. *Id.* at 148. The new school is a magnet school, which has greater emphasis on science education. *Id.* at 148-149. Mother moved to this school, located in the same school district, because she was hired to be the principal. O.F. indicated that she liked her new school, particularly the science curriculum. Mother testified that she brought O.F. to school early with her, where O.F. ate breakfast and socialized with the children of the teachers. During school, O.F. stopped in the office to say hello to Mother. After school, O.F. went to Mother's office to complete her homework. *Id.* at 154.

Meanwhile, Father has only been at his current address for three years. He is currently renting and is in the process of purchasing a home. *Id.* at 48-49. We fail to deduce that Mother's moves contributed to any sort of instability for O.F. The child has largely completed her education in the same school, except for the most recent move, where the evidence suggests she is thriving; for example, O.F. was asked to be in a robotics competition with LEGOs. *Id.* at 152. The court completely discounted the impact on O.F. of the transition

from Mother to Father and the imminent move Father will make when his family purchases a home.

The trial court surmised that O.F. will succeed in any school environment. We are not in the business of rating schools, but it should not be ignored that O.F. has a considerable advantage of being enrolled in a school where her Mother works. Mother has a unique opportunity to observe the child's education. *Id.* at 54. Mother's employment offers a consistent routine, and Mother does not need to enroll the child in daycare. *Id.* Conversely, Father's schedule alternates such that one week differs from the next. *Id.*

We do not share the trial court's conclusion that O.F.'s need for stability and continuity would be best served by disrupting the status quo. O.F. had been in Mother's primary care since she was three years old. When factoring in the pre-separation history, O.F. had resided with Mother for her entire life. As to this factor, the evidence does not support the finding that the child would be better served if she was in Father's primary custody.

The trial court made one other custody finding without evidentiary support in the record. Under Section 5238(a)(7)(the child's preference), the trial court noted that O.F. eagerly expressed her desire to remain in Mother's primary care. The trial court inferred that this eagerness and her attempt to reach out to the GAL *after* the custody hearing to reiterate her preference was the result of Mother's coaching or undue influence of the child. Nothing supports this inference.

It is unclear from the record what exactly transpired after the custody hearing. At the motion for reconsideration, Mother's counsel represented that she encouraged Mother to contact the GAL after Mother told her counsel of O.F.'s distress following the trial court's decision. It was alleged that O.F. had been upset after Father allegedly questioned O.F. about her *in camera* interview. The trial court's recollection of what transpired was also unclear. The trial court evidently instructed the law clerk to reach out to the GAL, who perhaps indicated that the child restated her preference that she stay with Mother. This restatement apparently caused the trial court to infer that Mother had influenced the child's stated preference. ***See*** N.T.*,* 11/14/17, at 26-29. Whatever action occurred post-trial, none of it should have been considered by the trial court.

However, in terms of O.F.'s actual preference, the trial court properly afforded it less weight. The record revealed that the child has told both her parents at different times that she wished to live primarily with each of them. Mother testified that the child has been placed in an impossible situation. ***See*** N.T.*,* 9/27/17, at 178. While both parents stated that they encouraged the child to tell the truth to the GAL and to the court, both admitted to speaking with the child about her preference beforehand. The stress of the pending litigation caused the child so much anxiety that Mother enrolled the child in therapy. ***Id.,*** at 179. Although O.F. told both the GAL and the trial court that while she considered living with Father, she stated her ultimate desire was to stay with Mother. It was reasonable of the trial court to conclude O.F. is an

- 19 -

unreliable narrator. *Id.*, at 234-235; *see also* Findings and Discussion, 10/19/17, at Factor 7. We disagree with the conclusion, however, that the child's eagerness to tell the court her preference, without more evidence, was indicative of Mother's attempt to coach the child. Indeed, nothing in the record supports this assumption.

As to the other statutory factors, the trial court generally found they favored neither parent in any meaningful way. Our review of the record supports this conclusion. Since these remaining factors favored neither parent, we cannot hold that the rest of the best interests analysis redeems the evidentiary deficiency of the previous discussion. We must reverse.

Usually the prudent practice of this Court is to avoid commenting on all of an appellant's issues if one issue constitutes reversible error. *See, e.g., Landis v. Landis*, 869 A.2d 1003 (Pa. Super. 2005). Because we assume that this case will be remanded to the same trial judge, it is necessary to address Mother's contention that the judge should have recused himself.

In addressing Mother's this issue, we hold that the circumstances of this case do not warrant such a recusal.

Our scope and standard of review regarding the subject is settled:

> The denial of a motion to recuse is preserved as an assignment of error that can be raised on appeal following the conclusion of the case. ***Reilly by Reilly v. Southeastern Pennsylvania Transp. Authority***, 507 Pa. 204, 489 A.2d 1291, 1300 (1985). We review a trial court's decision to deny a motion to recuse for an abuse of discretion. ***Vargo v. Schwartz***, 940 A.2d 459, 471 (Pa. Super. 2007). Indeed, our review of a trial court's denial of a motion to recuse is exceptionally deferential. *Id.* ("[W]e

> extend extreme deference to a trial court's decision not to recuse [.]"). As we explained in ***Commonwealth v. Harris***, 979 A.2d 387, 391–392 (Pa. Super. 2009) (*quoting in part **Commonwealth v. Bonds***, 890 A.2d 414, 418 (Pa. Super. 2005)), we recognize that our trial judges are "honorable, fair and competent," and although we employ an abuse of discretion standard, we do so recognizing that the judge himself is best qualified to gauge his ability to preside impartially. Hence, a trial judge should grant the motion to recuse only if a doubt exists as to his or her ability to preside impartially or if impartiality can be reasonably questioned. ***In re Bridgeport Fire Litigation***, 5 A.3d 1250, 1254 (Pa. Super. 2010).

***In re A.D.***, 93 A.3d 888, 893 (Pa. Super. 2014).

In the instant matter, Mother sought the trial judge's recusal when she learned, after the trial, that the judge and Father's wife were acquaintances in the local basketball coaching community. As evidence, she cited local news articles in which they were both mentioned, in passing, as assistants to a retiring high school coach. It appeared as though they were assistants at different times. While the wife also played for the retiring coach, it also appeared that the judge was not an assistant while the wife was on the team. Both have gone on to become active in local youth basketball programs. During the trial, Mother's counsel made it known that she had previously represented Father's wife in an uncontested divorce matter. All agreed that this presented no conflict, and the trial continued. At that moment, Mother argues, the trial judge should have acknowledged his own connection to Father's wife.

Although acknowledging his acquaintance may have been prudent, the judge's silence was not an error or unethical. At the post-trial recusal motion,

the judge admitted to knowing Father's wife, but said that they do not socialize. He explained that he previously learned from one of his ex-players that Father's wife was also involved in youth basketball. The judge specified that the wife works with the younger players, while he coaches the older group. However, he described the two groups as "significantly separate" from each other.

Moreover, this local community within Mifflin County appears quite small. For example, during her *in camera* interview, Je.F. mentioned to the judge that she saw the judge's wife in the grocery store where Je.F. works. Mother did not argue anything improper with this exchange or the familiarity that it could imply. Another example is the judge's familiarity with a lot of the officers in the community from his days as a magisterial district judge. The judge also knows many of the officers' children from his coaching activities. When these persons appear before him, the judge recognizes that he must decide, in each case, whether he should recuse. We presume he made the same consideration when Father's wife took the stand. Given their tangential relationship, we find no evidence to suggest an abuse of discretion when the judge presided over this case.

To support her claim, Mother cites the judge's own statement that he might recuse himself if the case is remanded. His statement, however, was not made in the context of his association with Father's wife, but rather, was a general comment regarding the complexity of this case. As this remand will now come to fruition, ***see infra***, we defer the recusal decision to the learned

- 22 -

trial judge, but note that he possesses the ability to make that decision for himself. **Arnold v. Arnold**, 847 A.2d 674, 680 (Pa. Super. 2004).

Our Supreme Court has recognized that it

> would be an unworkable rule which demanded that a trial judge **recuse** whenever an acquaintance was a party to or had an interest in the controversy. Such a rule ignores that judges throughout the Commonwealth know and are known by many people . . . and assumes that no judge can remain impartial when presiding in such a case.

**Commonwealth v. Perry**, 468 Pa. 515, 364 A.2d 312, 318 (Pa. 1976).

Because the trial court's decision to grant Father's request for modification constitutes an abuse of discretion, we need not address Mother's final claim: that the trial court misapplied the law when it failed to address the GAL's recommendation that O.F. remain with Mother. Nonetheless, we will discuss this claim briefly.

We have said "while a trial court is not required to accept the conclusions of an expert witness in a child custody case, it must consider them, and if the trial court chooses not to follow the expert's recommendations, its independent decision must be supported by competence evidence of record." **M.A.T. v. G.S.T.**, 989 A.2d 11, 20 (Pa. Super. 2010) (citations omitted). We have typically applied this rule to expert witnesses – usually forensic psychologists who performed a custody evaluation. This rule could extend to a GAL, but we have yet to do so; given our disposition based on Mother's other claims, we need not decide this issue. Of course, we are mindful that a GAL

is not a judicial officer, and a trial court shall not delegate its judicial power to a GAL. ***C.W. v. K.A.W.***, 774 A.2d 745, 749 (Pa. Super. 2001).

We note that in this case, the GAL was not called to testify nor was the report discussed at trial. ***See*** 23 Pa.C.S.A. § 5334 (statute is "suspended insofar as it [(1)-(3)], and (4) prohibits the guardian *ad litem* from testifying, pursuant to Pa.R.C.P. No. 1915.25.") The GAL report was made part of the record, and at the Reconsideration Motion, the trial court stated that it did consider the GAL report, even though the court did not mention it in its Findings and Discussion.

Mother's main argument is that the trial court did not specifically explain in its initial analysis why it departed from the GAL recommendation. We have never compelled a trial court to do this. Neither has our legislature obligated the trial court to discuss the GAL report. As we discussed above, there was a lack of evidence to support the trial court's decision. Under the facts of this case we conclude that the trial court's departure from the GAL report was against the weight of the evidence.

Decision reversed. Case remanded for a new custody order in light of our decision. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/21/2018