J-A09032-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| BRYCE ALLEN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANNA GUSHCHIN | : | |
| | : | |
| Appellant | : | No. 606 WDA 2025 |

Appeal from the Order Entered April 18, 2025
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD-22-008068-005

BEFORE: NICHOLS, J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED: June 9, 2026**

Anna Gushchin ("Mother") appeals from the order granting primary physical and sole legal custody of A.G. ("Child"), born in September 2019, to Bruce Allen ("Father"). On appeal, Mother claims the trial court's decision was against the weight of the evidence, the trial court erred in not reopening the record to allow her to submit the results of a psychological examination, and said refusal violated her right to procedural due process. Because Mother's issues do not merit relief, we affirm.

We take the underlying facts and procedural history in this matter from our review of the certified record and the trial court's October 16, 2025, decision. The parties married in December 2018. *See* Trial Court Opinion, 10/16/25, at 1. They separated in March 2022. *See id*. Father filed a complaint for custody in June 2022. *See id*. The trial court entered an interim order in February 2023, giving Father partial custody and expanding his

schedule of daytime visits up to three days per week. ***See id***. at 1-2. Father filed a complaint for divorce and equitable distribution in April 2023. ***See id***. at 2.

In June 2023, Mother filed for a protection from abuse ("PFA") order on behalf of Child. ***See id***. Mother claimed Child, then aged three-and-one-half, returned from Father's periods of custody with vaginal itching, a swollen vulva and clitoris, and regression in potty training. ***See id***. It does not appear a physician examined Child, but Mother "discussed" the issue with a physician who called in a report to ChildLine. ***See id***. at 2 n.2. Mother also claimed Father would hypnotize her, and she was concerned he was hypnotizing Child. ***See id***. The court entered a temporary PFA order suspending Father's periods of partial custody and referred the case to Allegheny County Office of Children, Youth, and Families ("CYF"). ***See id***. The PFA court also ordered a full custody evaluation. ***See id***. The final PFA hearing was continued several times because of the on-going CYF investigation; during this period, Father was allowed supervised visits with Child. ***See id***. at 2 n.3. In September 2023, Mother withdrew the PFA petition. ***See id***. at 2. Ultimately, CYF concluded the allegations were unfounded. ***See*** Trial Court Opinion, 4/14/25, at 2.

The trial court continued Father's supervised visits with Child and ordered custody conciliation. ***See*** Trial Court Opinion, 10/16/25, at 2-3. In November 2023, the trial court appointed a guardian *ad litem* ("GAL"), Lisa Standish, Esq. ("Attorney Standish") for Child. ***See id***. at 3. In February

2024, the trial court granted Father unsupervised overnight visits with Child and ordered the parties to participate in individual therapy with the Child participating once a month. *See id*.

In August 2024, Mother filed a second PFA petition on behalf of the then almost five-year-old Child. *See id*. The allegations therein were like those in the first PFA petition. *See id*. at 3 n.4. The trial court issued a temporary PFA petition and again suspended Father's partial custody and referred the matter to CYF. *See id*. at 3. A lengthy PFA hearing took place in September 2024. *See id*. at 4. The trial court dismissed the PFA petition and reinstated the prior custody order. *See id*. The court also ordered updated custody evaluations. *See id*.

In October 2024, the trial court entered an interim order granting Mother primary and Father partial physical custody. *See id*. On December 6, 2024, the trial court ordered Mother to engage one of two doctors to perform a psychological evaluation of her within ten days of the date of the order. *See id*. Mother did not comply and only agreed to a date so far distant that the report was not ready in time for the custody trial. *See id*. at 5, 46.

In February 2025, the trial court conducted a custody trial, which encompassed the complaint for custody and multiple motions for special relief and contempt filed by Father. *See id*. at 5. One month after the conclusion of the custody trial, Mother sought to reopen the record to include the results of her belated psychological evaluation. *See id*. The trial court denied the

motion. *See id*. The trial court issued an order granting Father primary physical custody and sole legal custody of Child. *See id*. This appeal followed.[1]

In its Rule 1925(a) opinion, the trial court summarizes, at length, and with detailed citations to the record, the trial testimony. *See id*. at 6-35. Of import to the instant appeal, we note the following.

At trial, the parties presented the testimony of expert forensic psychologist Dr. Natalie Bernstein, who performed a custody evaluation. *See* N.T., 9/8/25, at 3-123.[2] Dr. Bernstein found no psychological issues with Father and no concerns about Father's behavior with Child or his parenting ability. *See* Trial Court Opinion, 10/16/25, at 7-8, 10 (citing to notes of testimony).[3] However, Dr. Bernstein raised concerns about Mother's ability

_____

[1] Mother and the trial court complied with Pa.R.A.P. 1925.

[2] The original tape recording of Dr. Bernstein's testimony was largely unintelligible. She testified for a second time in September 2025 to correct the record.

[3] The only notes of testimony included in the certified record are Dr. Bernstein's original testimony, which was discarded, the notes from her second testimony, the notes of testimony from the second PFA hearing, and the notes of testimony from the interim custody hearing. This Court has clearly stated that it is the appellant's responsibility to ensure that the certified record contains all documents necessary to ensure that this Court is able to review his claims. *See Commonwealth v. B.D.G.*, 959 A.2d 362 (Pa. Super. 2008); Pa.R.A.P. 1926; Pa.R.A.P. 1931. Here, however, the record reflects that original counsel withdrew shortly after the certified record was sent to this Court and it is not clear that new counsel was aware of the deficiencies in the certified record. New counsel filed the complete notes of testimony in the
*(Footnote Continued Next Page)*

to co-parent, her pathologizing of normal childhood behavior, and her lack of understanding of childhood development. *See id*. at 8-10. She noted no behavior on the part of Child which would indicate abuse or mistreatment. *See id*. at 9. Further, Dr. Bernstein expressed her concern about Mother's repeated questioning of Child about abuse and subjecting Child to repeated evaluations and investigations, and videotaping and photographs, which, Dr. Bernstein suggested, caused some of Child's behavioral difficulties. *See id*. at 11. She further testified Mother was unlikely to stop accusing Father of abuse. *See id*. at 12.

Attorney Standish, the GAL testified about her review of both CYF investigations, her conversations with all parties, treatment/service providers, law enforcement, and other relevant third parties. *See id*. at 12-14. She highlighted that none of the agencies or individuals believed Child had been abused. *See id*. at 12. She discounted the photos taken by Mother during Father's supervised visits which Mother believed showed sexual behavior. *See id*. at 12-13. Attorney Standish interviewed the supervisor of that visit who disputed Mother's allegations. *See id*. at 13. Ms. Standish also pointed to Mother's interactions with the police where she complained, for thirty minutes,

---

reproduced record and Father did not raise any objections to the reproduced record. Given that this is a Children's Fast Track case, we will rely on the transcripts in the reproduced record. *See Commonwealth v. Barnett*, 121 A.3d 534, 545 n.3 (Pa. Super. 2015) (relying on transcript in reproduced record where no one disputed its accuracy).

that Father did not follow her sleep schedule for Child but only briefly mentioned possible sexual abuse. *See id*. at 13. Ms. Standish stated Child was being treated by a play therapist who had no concerns about possible sexual abuse but was concerned about Mother's paranoia, inability to answer questions, and "frenzied nature." *Id*.

Ms. Standish also testified that Dr. Deb Gilman, who supervised visits and check-in with the parties, supported Dr. Berstein's testimony that there were no concerns about Father and child abuse but, rather, concerns about Mother's lack of respect for Father and his role in the Child's life. *See id*. at 14. Initially, Mother attended Father's supervised visits, but Dr. Gilman ultimately banned her from attending. *See id*. at 17.

The trial court noted Mother is involved with the Center for Victims. *See id*. An advocate from the Center approached Attorney Standish, informing her they were familiar with this case and telling her about another case where the authorities found allegations of abuse unfounded only to have the father later criminally charged with abuse. *See id*. The advocate also appeared at the custody hearing, without leave of court, introduced herself to the court, and stated she was there in support of Mother. *See id*.

The trial court also summarized Father's testimony, the court credited his testimony regarding the over-involvement of Mother's family in her life, their marriage, and their resentment of him. *See id*. at 15. He recounted Mother's refusal to allow him to see the Child, her scheduling of events for

Child during his custodial periods, and her refusal to allow him make-up time. *See id*. at 15-16. Father stated he never abused Child. *See id*. at 15-16. Father is taking parenting classes and acknowledged he needs to enforce a steady sleep schedule with Child. *See id*. at 19. Father stated he would eventually like a shared custody schedule but believes it will not work unless Mother changes her behavior. *See id*. at 19-20.

Cassandra Spivak, a CYS caseworker, testified that she had observed Child placing her hand over her clothing in the genital region during a visit with her and Mother but did not observe any of the other behavioral issues described by Mother. *See id*. at 20-21. Child refused to participate in a forensic interview or medical examination, and the abuse investigation was closed as invalid. *See id*.

The trial court did not credit Mother's testimony. *See id*. at 22-32. The trial court detailed, along with lengthy quotations from the record, Mother's bizarre behavior at trial, including her looking to Father for approval or to recollect incidents, her "frenzied and unresponsive testimony," and her complete inability to answer questions. *Id*. Mother gave detailed, explicit, and unnecessary testimony concerning her sexual history with Father. *See id*. at 24-25. Mother admitted that she brought her parents and grandfather to a meeting with Father to discuss reconciliation. *See id*. at 25-26. Despite evidence to the contrary, Mother denied withdrawing the initial PFA. *See id*. at 17. She reiterated her allegations concerning sexual abuse by Father but

described his sexual behavior in relationship to herself, not Child. **See id**. at 27-28. Mother acknowledged she would not allow Father to have make-up visits with Child because then her parents would have to do the custody exchange, but Mother was unable to clearly explain why this was a problem. **See id**. at 29-30. Mother admitted on cross-examination that she never took Child to a physician to have her vaginal rash and swelling examined. **See id**. at 31. She also admitted to deliberately scheduling activities for Child during Father's periods of custody. **See id**. at 32.

On appeal, Mother raises the following issues for our review:

I. Whether the trial court abused its discretion and/or erred as a matter of law in awarding primary physical custody to Father, as the trial court's decision was not supported by the weight of the evidence and failed to give appropriate consideration to the best interests of the Child under 23 Pa.C.S.A. § 5328?

II. Whether the trial court abused its discretion and/or erred as a matter of law in failing to properly apply the statutory custody factors, particularly factor eight, regarding attempts of a party to turn the Child against the other party in determining that Mother's actions were not reasonable safety measures or reasonable efforts to protect the Child and considering those efforts as attempts to turn Child against Father?

III. Whether the trial court abused its discretion and/or erred as a matter of law in limiting Mother's legal/physical custody without sufficient findings of fact or justification based on the record?

IV. Whether the trial court abused its discretion and/or erred as a matter of law in denying Mother's request to reopen the record to submit Mother's court-ordered psychological report?

V. Whether the trial court abused its discretion and erred as a matter of law by committing multiple errors during the trial, which, when considered cumulatively, denied Mother a fair trial in violation of due process [of law]?

Mother's Brief at 7-8 (renumbered, capitalization, citation format, and punctuation standardized).[4]

We review Mother's issues on appeal which pertain to the trial court's custody award according to the following standard and scope of review:

> Our standard of review over a custody order is for a gross abuse of discretion. Such an abuse of discretion will only be found if the trial court, in reaching its conclusion, overrides or misapplies the law, or exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias, or ill-will as shown by the evidence of record.
>
> In reviewing a custody order, we must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the trial court who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law[] or are unreasonable in light of the sustainable findings of the trial court.

***Rogowski v. Kirven***, 291 A.3d 50, 60-61 (Pa. Super. 2023) (citations and brackets omitted, paragraphing altered).

Thus, it is not our function "to determine whether the trial court reached the 'right' decision; rather, we must consider whether, based on the evidence presented, given due deference to the trial court's weight and credibility

---

[4] Mother raises six issues in her brief but acknowledges the first issue is waived and presents no argument on that issue. ***See*** Mother's Brief at 7-8, 21, 13.

determinations, the trial court erred or abused its discretion." ***King v. King***, 889 A.2d 630, 632 (Pa. Super. 2005) (internal quotation marks and citations omitted).

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S.A. §§ 5321-5340.  When awarding any form of custody, the trial court is required to consider the child's best interests pursuant to the following sixteen factors set forth in section 5328(a):

> (a) **Factors.**--In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:
>
> > (1) Which party is more likely to ensure the safety of the child.
> >
> > (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
> >
> > (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
> >
> > (2.2) Violent or assaultive behavior committed by a party.
> >
> > (2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.
> >
> > (3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child or self from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

- 11 -

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[5]

The trial court is required to consider all the factors listed in section 5328(a) when entering a custody order. *See J.R.M. v. J.E.A.*, 33 A.3d 647, 652 (Pa. Super. 2011). As the finder of fact, the trial court determines which factors are most salient and critical in each case. *See E.B. v. D.B.*, 209 A.3d 451, 468 (Pa. Super. 2019). After the trial court has reached a decision regarding custody, the court must delineate the reasons for its custody decision either on the record in open court, or in a written opinion or order. *See* 23 Pa.C.S.A. § 5323(d). However, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa. Super. 2013).

In the instant matter, the trial court issued written findings of fact and conclusions of law regarding the section 5328(a) custody factors in a written opinion and found that factors (1), (2), (2.3), (4), (8), (9), (13), (15), and

---

[5] Our General Assembly amended section 5328(a) on June 30, 2025, with an effective date of August 29, 2025. As the subject proceedings occurred before the effective date of the amendments, they did not apply here. *See R.M. v. J.S.*, 20 A.3d 496, 513 n.15 (Pa. Super. 2011) (declining to apply the revised version of a statute in proceedings that concluded in the trial court several months prior to the effective date of the at-issue legislation).

(16) weighed in favor of Father. **See** Trial Court Opinion, 4/14/25, at 2-6. The court determined that factor (5) weighed in favor of Mother. **See id**. at 3. Finally, the court found that factors (3), (5), (8), (10), (11), (12), and (14) were neutral, and that factors (2.1), (2.2), (6), and (7), were not applicable in this case. **See id**.

In Mother's first three issues, she challenges the trial court's findings pursuant to the custody factors set forth at section 5328(a). **See** Mother's Brief at 14-30. As explained above, we must accept the findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. **See Rogowski**, 291 A.3d at 60-61. In addition, regarding issues of credibility and weight of the evidence, we must defer to the trial court, who viewed and assessed the witnesses first-hand. **See id**. We may reject the conclusions of the trial court only if they involve an error of law or are unreasonable considering the sustainable findings of the trial court. **See id**.

The paramount concern in a child custody case is the best interests of the child based on the consideration of all factors that legitimately affect the child's physical, intellectual, moral, and spiritual wellbeing. **See Landis v. Landis**, 869 A.2d 1003, 1011 (Pa. Super. 2005).

In her first issue, Mother complains that the trial court's initial order is "brief and lacking in detail." **See id**. at 14. Mother then undertakes her own analysis of each of the factors, viewing the record in the light most favorable

to herself, and, not surprisingly, finding, unlike the trial court, that most of the factors favor her. *See id*. at 15-23. Mother also maintains the trial court erred in not following Dr. Bernstein's recommendation that the parties share legal and physical custody of Child. *See id*. at 20-21. Mother further contends that Father's request for primary physical custody is inconsistent with his earlier requests for shared custody, the trial court improperly opined on "the quality of the marriage," and the trial court overly relied on its "frustration" with the way Mother answered questions. *Id*. at 21-23.

> The trial court explained:
>
> Father's testimony and that of Dr. Bernstein, was compelling and credible. Father is quite capable of parenting effectively. Mother's testimony only reinforced [the trial c]ourt's grave concerns drawn from both Father and Dr. Bernstein's testimony. She was not credible and her demeanor during her testimony was . . . quite concerning. She struggled to answer questions directly and was disjointed and corybantic. The testimony and evidence presented overwhelmingly supported [the trial court's] determination that Mother's inability to separate reality from her fears and concerns was negatively impacting the Child. Mother lacks insight into her own behavior, and Dr. Bernstein found it unlikely she would retreat from her unfounded insistence that Father is abusing the Child. All of the witnesses described a situation in which Father was bullied, denigrated and not trusted with the care of the Child.
>
> Altogether, [the trial c]ourt's factual findings, issued contemporaneously with the custody order in this matter evidence that [it] was mindful of the best interests of the [c]hild standard and applied it throughout. Moreover, to the extent that the concept of "weight" is applicable, the great weight of the evidence supported [the trial c]ourt's decision to limit Mother's custodial time and legal custody to protect the Child.

Trial Court Opinion, 10/16/25, at 39-40.

- 14 -

Based on our review, we discern no abuse of discretion by the trial court. With respect to the brevity and lack of detail in the trial court's initial order, the trial court is not required to file a written opinion at all, **see** 23 Pa.C.S.A. § 5323(d), and any opinion is sufficient so long as "the enumerated factors are considered and that the custody decision is based on those considerations." **M.J.M.**, 63 A.3d at 336. Here, the trial court's April 2025 written opinion considered all the factors and explained how and why they influenced its decision. **See** Trial Court Opinion, 4/14/25, at 2-9. Our law requires nothing further. **See M.J.M.**, **supra**.

Mother's argument that the trial court erred in not following Dr. Bernstein's recommendation for shared legal and physical custody is equally unavailing. First, Mother misstates the record. Dr. Bernstein conducted two evaluations of the parties, after the first evaluation, because Child had not had contact with Father because of the temporary PFA, she recommended shared custody. **See** N.T., 9/8/25, at 6, 25-26, 36-37. However, following the second evaluation, Dr. Bernstein testified she did not object to Father having primary physical or sole legal custody if Mother continued to make allegations against Father. **See id**. at 66. In any event, this Court has stated:

> [t]he trial court [is] under no obligation to delegate its decision-making authority to [an expert]. It is an abuse of discretion, however, for a trial court to dismiss as unpersuasive, and to totally discount, uncontradicted expert testimony. Accordingly, while a trial court is not required to accept the conclusions of an expert witness in a child custody case, it must consider them, and if the trial court chooses not to follow the expert's recommendations, its

independent decision must be supported by competent evidence of record.

***M.A.T. v. G.S.T.***, 989 A.2d 11, 19-20 (Pa. Super. 2010) (*en banc*) (internal citations, quotation marks, and some brackets omitted). Here, the trial court discussed Dr. Bernstein's testimony in detail, considered both her recommendations, and ultimately decided that giving Father sole legal and primary physical custody was in the best interests of Child. Our review of the record demonstrates this decision was supported by competent evidence and this issue does not merit relief. ***See M.A.T.***, ***supra***.

Mother next maintains the trial court ignored that Father had originally requested only shared custody and now sought primary physical custody. ***See*** Mother's Brief at 20-21. Mother's argument on this point consists of two sentences and is devoid of citation to any legal authority or any analysis. This claim is waived. ***See*** Pa.R.A.P. 2119(a) and (b) (requiring an appellant to discuss and cite pertinent authorities); ***Commonwealth v. Antidormi***, 84 A.3d 736, 754 (Pa. Super. 2014) (finding issue waived because the appellant "cited no legal authorities nor developed any meaningful analysis").

Mother also claims the "trial court improperly opined on the quality of the marriage." ***See*** Mother's Brief at 22. Again, we note Mother's one-paragraph argument on this issue is devoid of both analysis and citation to legal authority. ***See id***. Further, we see nothing in the trial court's opinion that suggested any opinion on the parties' marriage. Also, to the extent Mother claims the trial court held her "cultural" values or the fact she lives

close to her extended family against her, this claim is not supported by the record. The one factor the trial court found in Mother's favor was her connection with her extended family. *See* Trial Court Opinion, 4/14/25, at 3. Mother attempts to argue the trial court was biased against her culture, traditional values, and her close relationships with extended family, but Mother fails to point to any evidence to support this claim. *See* Mother's Brief at 22. We have reviewed the record, and the trial court appropriately discussed the issue, testified to by both Dr. Bernstein and Attorney Standish, of Mother's decision to involve members of her extended family into the custody issue and to enlist their support in obtaining evidence which Mother believed indicated Child was abused. *See* N.T., 2/24/25, at 20-22; N.T., 9/8/25, at 42-43. This claim does not merit relief.

Mother also complains the trial court placed undo emphasis on her "manner of testifying." Mother's Brief at 22-23. Mother opines, without citations to the record or to any pertinent legal or other authority that her manner of answering questions was not "uncommon" to "well-educated" individuals who worked in a field "requiring intense focus." *See id*. at 23.

In its Rule 1925(a) opinion, the trial court commented that:

> the rambling and erratic nature of Mother's answers to questions from both attorneys and [the trial c]ourt, were disquieting and significant. Mother presented very poorly in her testimony and [the trial c]ourt discounted significantly her credibility. She struggled to answer the questions that were asked of her, instead embarking upon sometimes multi-page answers that completed [sic] abstracted the question she had been asked. On one occasion, inquiring about why Mother needed to do all of the

exchanges despite the significant involvement of her parents, the [trial court] asked a simple question regarding Maternal Grandfather's availability, but Mother['s] response was meandering and non-responsive:

* * * *

With all due respect, the court order that prevented my mom from doing exchanges, and she's the primary caregiver on the two days a week that I work, because the rest of the days -- I have done every single exchange. So[,] my mom was barred from doing those exchanges and my father with all due respect, Your Honor, the history has been that we don't need to get into minutia, but I don't feel comfortable with sending my dad. Because the exchange that [Father] referred to, for example, the last time all our families were together, was during the winter solstice this year. All of us were present. My dad was talking to his mom and dad at the campfire. It's an outdoor school, right. The issue was that that day - so [Child] missed solstice the previous year. So[,] I asked him, can we just have her involved in this. So[,] he agreed. He said his parents were visiting. We[']ll have this event.

Well, that is actually his dad's birthday. So[,] my mom came up. [Child's] feet got cold. We already heard all of this. My mom came up and gave the gift from our family for [paternal grandfather's] birthday, his dad's birthday. Well, [Father's] recollection of the events of that solstice party is quite different than what mine is. And I don't feel comfortable of my parents being accused of crying at an exchange or something like that. Because I will tell you one thing. From the child psychology course and just my own maternal instinct, what I tell our daughter when she goes for exchanges and she might not be feeling okay, I say, you know what. As long as you're okay and you're happy, wherever you're doing, whatever you're doing, I'm happy.

I want her to know that she's going to be okay. And I'm going to be okay. And he doesn't have to worry

- 18 -

about me.  But I don't want to worry about my elderly parents who [Father] -- we have a lawnmower.  It's kind of a stupid story, but my dad went to borrow our lawnmower at 97[-]degree weather.  [Father] didn't tell him that it was broken.  It was a simple thing, but it created a problem where somebody who is in their seventies is mowing a lawn with a broken lawnmower at a 45-degree angle.  It would be simple to just say, the lawnmower is broken.  Sorry.  I didn't have a chance to fix it.  You know.  I'm sorry.  This is minutia, but it's important to me because of the safety of both my parents and grandfather is really important.

Trial Court Opinion, 10/16/25, at 42-44 (quoting N.T., 2/25/25, at 231-35).

The trial court also quoted from many other portions of the notes of testimony where Mother rambled and offered irrelevant and, sometimes, inappropriate answers to basic questions.  *See id*. at 22-32.  The trial court's discussion of Mother's inability to answer basic questions was corroborated by both Dr. Bernstein and Attorney Standish, their opinions were based not only upon their own interactions with Mother but their conversations with other professionals who interacted with Mother during the various investigations and had the same difficulty.  *See* N.T., 2/24/25, at 27-28, 35, 41, 43, 47-48, 50; N.T., 9/8/25, at 51.

The trial court's concern about Mother's inability to answer questions was supported by substantial evidence.  Our own review of the record and of Mother's testimony led this Court to question Mother's mental stability, and ability to focus.  Mother's claim that the trial court's decision was against the weight of evidence is meritless.  *See Rogowski*, 291 A.3d at 60-61.

Mother also contends the decision was against the weight of the evidence because the trial court improperly applied custody factor eight, concerning attempts of one parent to turn a child against the other parent because Mother's actions were reasonable efforts to protect Child from abuse. *See* Mother's Brief at 26-27.

The trial court explained:

In [the trial c]ourt's findings issued concurrently with the final order in this matter, the following reasoning was presented:

While there was not testimony or documentary evidence presented that Mother explicitly acted to turn Child against Father, her behavior in repeatedly alleging abuse and disrupting Father's custodial time is the constructive equivalent of such action. Mother's actions as recounted above were not *reasonable* safety measures or *reasonable* efforts to protect the child and therefore can be properly considered by [the trial c]ourt as attempts to turn the Child against Father.

Trial Court Opinion, 4/14/25, at 4.

To summarize, Mother filed two PFAs in this matter—both insinuating that the Child was being sexually abused by Father. CYF and police investigations were initiated, the child was forensically interviewed, and ultimately no evidence of sexual abuse or maltreatment was discovered. These filings significantly disrupted and impacted Father's custodial time, in the first instance preventing him [from] seeing his daughter in any fashion for four months. Following that period of no visitation, he was subjected to supervised visitation before regaining unsupervised time. After the filing of the second PFA, [F]ather was again unable to see the [C]hild, this time for six weeks, before regaining supervised, and ultimately unsupervised time. Nonetheless, Mother continues to maintain that [F]ather is committing some form of sexual abuse against the [C]hild. *See* N.T., 2/25/25 at 256-58. Her attitude towards these serious allegations is that despite having no evidence Father is sexually assaulting the Child

- 20 -

"I would rather be wrong" which insinuates a reckless lack of understanding of the consequences of these reports to both Father and Child. *See id*. at 256.

Inexplicably, and troublingly, despite maintaining that Father was or is sexually abusing the Child, Mother's demeanor and actions during her testimony indicated that she was looking to Father for support or guidance in her testimony. *See id*. at 209-10, 211.

\* \* \* \*

Mother's behavior in this matter was not a collection of reasonable efforts to protect the Child. Her repeated accusations and decisions to subject the Child to intrusive investigations and questioning were based entirely upon her unsupported beliefs that Father was abusing the Child. This issue is meritless.

Trial Court Opinion, 10/16/25, at 40-42, 44 (some bracketing omitted, citation format regularized, emphases in original).

The record supports the trial court's conclusion. Both Dr. Bernstein and Attorney Standish testified about Mother's inability to distinguish between normal childhood behavior and sexual behavior; both stated that Mother continued to believe the narrative she created about Father sexually abusing Child; both noted their belief that Mother would continue to make these types of allegations. *See* N.T., 2/24/25, at 29-31, 45, 47-48, 51; N.T., 9/8/25, at 11-13, 31, 35, 48-50, 52, 58-61. Dr. Bernstein and Attorney Standish agreed that Mother saw no value in Father, would be pleased if Father was not involved in Child's life, and could not point to a single positive parenting behavior involving Father. *See id*. at 33, 42, 47, 50, 52; *see id*. at 28, 43-44, 64. Dr. Bernstein and Attorney Standish expressed concerns that Mother's attitude, as well as her continued allegations, investigations, spying on Father

- 21 -

and Child during supervised visits, and questioning and photographing/videotaping of Child, were all having a negative impact on both Child and Father. *See id*. at 38, 41-43, 45, 48-49; *see id*. at 29-30, 36-37, 40-43, 45-47, 52-59, 62-63. Attorney Standish and Dr. Bernstein raised concerns about Mother's continued attempts to find support for her allegations by involving third parties and inducing them to contact authorities; not to mention Mother's three contacts with the police. *See id*. at 21-23, 26-29; *see id*. at 42-43. Attorney Standish testified to the difficulties she had in getting Mother to respond to emails seeking to set up a visitation schedule, and that Mother's own counsel at the time was unable to get her to agree to a court-ordered visitation schedule with Father. *See id*. at 25-26, 28-29, 37-38. In sum, the record amply supports the trial court's evaluation of factor eight as favoring Father. We have no basis to disturb this finding. *See Rogowski*, 291 A.3d at 60-61.

In her third issue, Mother claims the trial court's decision to give Father sole legal custody and to limit her physical custody is against the weight of the evidence. *See* Mother's Brief at 27-30.

The trial court stated:

As recounted above and in [the trial c]ourt's findings of fact, the vast majority of the sixteen custody factors clearly favor [F]ather. Importantly, as [the trial c]ourt explained at length in its findings under the "any other relevant factor" portion, Mother was not capable of coparenting. Her inability to coparent with Father negatively impacted the Child and necessitated the changes to physical and legal custody. As [the trial c]ourt stated in its findings:

- 22 -

The evaluation completed by Dr. Bernstein and the report of the GAL revealed . . . that Mother is guarded in her interactions with outside individuals. Her [test] scores reported by Dr. Bernstein . . . were elevated and indicated this avoidant nature, and potentially a failure to be fully honest. Additionally, Mother did not share with Dr. Bernstein that she sees an individual therapist. This stands in contrast with Dr. Bernstein's testimony that [she] found no [c]oncerns with Father.

Both the GAL and Dr. Bernstein expressed that they do not believe Mother is currently capable of co-parenting, with Dr. Bernstein opining that Mother will not achieve an ability to co-parent on her own, that is without professional intervention. Dr. Bernstein explained that if the Child continues to grow up with the current level of conflict initiated between the parties by Mother's repeated allegations, she will develop an anxiety disorder.

Until Mother addresses what is driving her decisions to lodge repeated and unfounded allegations against Father, and attains a level of stability to effectively co-parent, she will not be in a position to exercise legal custody over the [C]hild[] and potentially will cause her time with the Child to be limited or supervised. [The trial c]ourt will not tolerate repeated and unfounded allegations of abuse that carry significant collateral consequences for the accused.

Trial Court Opinion, 4/14/25, at 6. There was ample support in the record, and detailed findings from [the trial c]ourt, to support the changes in physical and legal custody.

Trial Court Opinion, 10/16/25, at 44-45.

As our review of the record, detailed above, demonstrates the trial court's decision to give sole legal custody and primary physical custody is well-supported by the evidence, which demonstrated Mother is either unable or

- 23 -

unwilling to co-parent Child. Mother's third issue does not merit relief. *See Rogowski*, 291 A.3d at 60-61.

In her fourth issue, Mother contends the trial court erred in not reopening the record to allow her to submit the court-ordered psychological report. *See* Mother's Brief at 30-32.

The trial court explained, firstly, that Mother had not cited, and the trial court was unable to find, any legal basis which would allow for the reopening of the record in custody matters. *See* Trial Court Opinion, 10/16/25, at 46-47. The court further noted there was no basis for reopening the record because the delay in obtaining the report was caused by Mother's own intransigence and her failure to comply with the court's order. *See id*. Moreover, the trial court noted the hardship this would cause because, over one month after completing a two-day trial in this matter, the court would need to schedule a third day to allow Father the opportunity to question Mother's expert. *See id*.

We have reviewed the argument, and Mother fails to cite any legal support of her claim that the court is allowed to reopen a custody record. *See* Mother's Brief at 30-32. We concur with the trial court that there is little or no legal authority with respect to this issue. *See Adoption of A.T.I.*, 227 A.3d 428, 2020 WL 829453 at *5-6 (Pa. Super. Feb. 19, 2020) (unpublished memorandum) (discussing in a non-precedential decision the dearth of

authority in domestic relations cases regarding reopening the record).[6] In any event, Mother's argument that the trial court abused its discretion in not allowing a novel remedy for a situation Mother caused by her lack of compliance with a court order does not merit relief.

In her final claim, Mother claims the trial court's cumulative errors in this case violated her right to due process. *See* Mother's Brief at 33-35. Mother does point to, and we have been unable to locate any place in the record where she raised a constitutional claim. Rather, it appears Mother raised this issue for the first time in her Rule 1925(b) statement. However, an issue cannot be raised for the first time in a Rule 1925(b) statement, nor can a legal theory be raised for the first time on appeal. *See Swatt v. Nottingham Village*, 342 A.3d 23, 36 (Pa. Super. 2025) (*en banc*); *Cabot Oil and Gas Corp. v. Speer*, 241 A.3d 1191, 1196 (Pa. Super. 2020). Because Mother did not raise this claim below, it is waived.

In any event, the claim does not merit relief. This Court has stated, "A question regarding whether a due process violation occurred is a question of law for which the standard of review is *de novo* and the scope of review is plenary." *S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa. Super. 2018) (citation omitted). "It is well settled that procedural due process requires, at its core,

---

[6] *See* Pa.R.A.P. 126(b) (unpublished non-precedential memoranda decision of Superior Court filed after May 1, 2019, may be cited for persuasive value).

adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case. Due process is flexible and calls for such procedural protections as the situation demands." *Id*. at 1161 (citations and quotation marks omitted).

Here, while Mother speaks of cumulative errors, the only error she points to in her argument is the trial court's failure to reopen the record to allow for submission of the late psychological report. *See* Mother's Brief at 33-36. As noted above, Mother has failed to point to any law that allows for the reopening of a record in a custody case, particularly when Mother caused the delay by failing to comply with a trial court order. Here, there was a two-day trial in this matter, Mother testified, cross-examined Father and his witnesses, submitted exhibits into evidence, and presented witnesses in support of her claim. Due process requires no more. *See S.T.*, *supra*. Mother's final issue is frivolous.

For the reasons discussed above, we affirm the trial court's grant of primary physical and sole legal custody to Father.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

6/9/2026